IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-75,048




 


GERALD EDWARD MARSHALL, Appellant



v.



THE STATE OF TEXAS






ON DIRECT APPEAL

FROM CAUSE NO. 948591 FROM THE 180TH DISTRICT COURT

HARRIS COUNTY




 Hervey, J., delivered the opinion for a unanimous Court.


O P I N I O N


 Appellant and several other people were involved in a robbery during which the victim was
shot once in the face and killed. A jury convicted appellant of capital murder as a result of this
event. The trial court sentenced appellant to death pursuant to the jury's answers to the special issues
submitted at the punishment phase of trial. Finding the thirteen points of error raised by appellant's
counsel to be without merit, we affirm the trial court's judgment. (1)

 It is necessary to set out in some detail the evidence presented in this case because appellant
claims in point of error three that the evidence is factually insufficient to support a finding that he
shot the victim. The jury charge authorized the jury to convict appellant of capital murder only if
it found that appellant himself shot the victim (there was no parties instruction in the charge).

 The record reflects that around 4:00 a.m. on May 11, 2003, appellant, Ronald Worthy and
Kenny Calliham were involved in a robbery at a Whataburger restaurant during which a mentally
retarded Whataburger employee was shot at close range through the left eye and killed. The
Whataburger drive-through window was open, but the doors to the Whataburger were locked. The
police were unable to enter the Whataburger through these doors when they responded to a robbery
in progress call.

 The evidence shows that appellant, Worthy and Calliham pulled up to the Whataburger drive-through window in a car driven by Calliham. The car belonged to the boyfriend of appellant's sister
(Julia). One of the car's occupants entered the Whataburger through the drive-through window
armed with a pistol. A Whataburger employee (Marsh) saw this armed assailant exit the back seat
of the car and come through the drive-through window. Marsh hid behind some boxes in a
storeroom where he could "see and hear."

 Marsh testified that the victim ran out the back door and slammed it against the assailant who
was chasing the victim. Marsh heard the assailant hit the door several times while the victim
attempted to keep it shut from the outside. Marsh also heard the assailant tell the victim to open the
door. Marsh heard the back door open. Marsh testified that the assailant and the victim went out
the back door which then shut and locked.

 Marsh did not hear anything for "about two minutes" at which time he "heard a noise inside
the building again." Marsh then heard the same assailant inside the Whataburger close to the back
door tell the victim three times that he would kill him if the victim did not produce the key to the
safe. (2) Marsh heard the victim tell the assailant twice that he did not have the key to the safe. Marsh
testified that the assailant shot the victim just after the assailant threatened him the third time. Marsh
could only see the back part of the victim and [v]ery little of the [assailant]."

 Marsh also testified that he never heard or saw a second assailant inside the Whataburger and
that "the person who shot [the victim] was the same person [he] saw come through the window." 
Marsh testified:

 Q. [STATE]: I want to ask you this. And I want you to think hard about it. To your
knowledge, besides that one man who came through [the drive-through window] with
the gun in his hand, did anybody else come into the Whataburger from what you
could hear and from what you could see?


 A. [MARSH]: I did not hear nobody [sic] that came inside and I did not see nobody
came [sic] inside, only one person I saw inside the building.

* * *

 Q. Is there any doubt in your mind that the person who shot [the victim] was the
same person who you saw come through the [drive-through] window?


 A. That's the same person I saw coming through the [drive-through] window and
shot [the victim].


 Another Whataburger employee (Ketchum) hid in a freezer when he saw the assailant enter
the Whataburger through the drive-through window. Ketchum testified that the assailant was
wearing a baseball cap and had a red bandana "cowboy style" over his mouth. Ketchum also
testified that the assailant had a silver gun. Marsh testified that he thought the assailant was wearing
a black bandana and no hat. Marsh testified that the assailant had a shiny gun. Appellant's girlfriend
(Woods) testified that she saw appellant with a silver gun about three hours after the victim's
murder. Appellant admitted in a statement to the police that Woods saw him with a silver gun about
five hours before the victim's murder. The police recovered a fired bullet and a shell casing from
the crime scene. The murder weapon was never recovered.

 The police believed that the robbery was an "inside job" also involving the Whataburger
night-manager (Love), who knew appellant from having worked with him at another fast-food
restaurant. Evidence was presented that Love was supposed to be at the Whataburger during the
robbery and give the robbers about $7,000 without anyone getting hurt. Love, however, left the
Whataburger before the offense was committed. When questioned by the police on the afternoon
of May 11th, Love denied any involvement in the offense. Love's cell phone records showed
numerous calls to Julia's apartment before the victim's murder. Appellant told Woods shortly before
the offense that he planned to rob some Whataburgers, and Woods saw appellant with a napkin that
had Love's first name and phone number written on it.

 The day after the offense, the police received a Crimestoppers tip that two persons nicknamed
"Bo" and "Tank" were involved in the offense and that "Bo" was the shooter. The police
investigation revealed that appellant went by the nickname of "Tank." The police initially believed
that a person whose last name was Robinson was the "Bo" mentioned in the Crimestoppers tip. The
police showed Marsh a photospread containing appellant's picture and a photospread containing
Robinson's picture. Marsh did not pick anyone out of the photospread containing appellant's
picture. Marsh immediately picked Robinson out of the photospread containing his picture.

 The police, however, eventually eliminated Robinson as a suspect. One of the homicide
investigators (Moreno) believed that there was a "strong resemblance" between Robinson and
Worthy who also went by the nickname of "Bo." The police arrested appellant, Worthy, Calliham
and Love who were all charged with capital murder. The police recovered the car that was used in
the offense at the home of appellant's aunt.

 At trial, Marsh identified appellant as the one he saw come through the Whataburger drive-through window. Marsh testified that he meant to pick appellant's picture (not Robinson's) when
the police showed him the two photospreads. The record reflects that Marsh never identified
appellant before trial as the person he saw come through the Whataburger drive-through window. (3)

 Calliham testified that Worthy was in the front passenger seat and appellant was in the back
seat when he drove the car up to the Whataburger drive-through window. Calliham claimed at trial
that he was unaware of any planned robbery until appellant went inside the Whataburger through the
drive-through window with a silver pistol in his hand. Calliham testified that he did not see where
Worthy went but it seemed like Worthy was chasing him as he drove off into a parking lot. Calliham
also testified that he could see Worthy behind the car when he heard a single gunshot.

 Calliham also testified that he made a deal with the State to plead no contest to an aggravated
robbery charge with no adjudication and receive ten years "probation" in exchange for his testimony. 
On cross-examination, Calliham testified that he previously told the police that appellant had a black
pistol and that he did not know where Worthy went when appellant went inside the Whataburger
through the drive-through window. Calliham also testified on cross-examination that he previously
told the police that, after he heard a gunshot, he saw both appellant and Worthy with pistols running
back to the car from the area of the drive-through.

 A county jail inmate (Green) testified that in August 2003 appellant told him that he was the
one who shot the victim. Green was facing 25 years to life on pending charges. He made a deal with
the State for a year in the county jail on these charges in exchange for his testimony.

 The State also presented evidence that appellant initially told the police that he was not
involved in the offense. Appellant later admitted to the police (homicide investigator Scales) that
he, Calliham and Worthy were involved in the offense. Appellant claimed, however, that his
involvement in the offense was minimal, limited to watching the back door with a brown gun with
no bullets in it, while only Worthy went inside the Whataburger through the drive-through window
and killed the victim. (4)

 Appellant also told Scales that he was in the back seat of the car when it pulled up to the
Whataburger drive-through window. Scales testified at trial:

 Q. [DEFENSE]: One thing I would like to make clear. On page 15, near the bottom,
when you [Scales] are trying to establish who is sitting where in the car, [appellant]
told you that he was in the passenger seat-I am sorry, passenger back seat; is that not
correct?


 A. [SCALES]: Correct.


 Q. About a line or so below there you say, Who was in the driver's seat? And
[appellant] said [Worthy].


 A. Correct.


 Q. At all other times did he not just tell you that [Calliham] was driving?


 A. He did refer that [sic], yes.


 Q. So, with that-if you know, was that simply a mistake on his part or he didn't
understand the question or something wrong? Because he never tried to convince
anyone that [Worthy] was driving other than that.


 A. Apparently not, but right there you are right.


 Q. But he always said [Calliham] was driving?


 A. I think so.


 An audiotape of appellant's interview with Scales (State's Exhibit 45) reflects that appellant
told Scales that he was in the back seat and that Worthy and Calliham were in the front seat with
Calliham driving when the car pulled up to the Whataburger drive-through window.

 Q. [SCALES]: You go to the drive-thru, ok. [Calliham's] driving. . . .was there any
other vehicles in the drive-thru with you or?


 A. [APPELLANT]: Uh-uh.


 Q. About what (inaudible) what time of night?


 A. It was about 5:00.


 Q. Early, early morning.


 A. Early in the morning.


 Q. Like 4:00 or so, ok. Between 4:00 or 5:00 am on May 11th which is Sunday
morning. Saturday night, Sunday morning. You pull through the drive-thru, where
are you in the car?


 A. Uh, I was in like the passenger back seat.


 Q. The back seat.


 A. But I was behind the passenger seat. He was in the driver's seat.


 Q. Who was in the driver's seat?


 A. [Worthy].


 Q. Ok and [Calliham's] driving. Then, what happens when you come up to the
window? The drive thru window.


 A. He got out and he came up to the window.


 Q. Who's this, [Worthy]?


 A. Yeah, and he jumped through there and I see the people going.


 Marsh testified that, when the car pulled up to the drive-through window, there was only one
person in the back seat and that this was the person who came inside the Whataburger through the
drive-through window.

 Q. [STATE]: Could you see anybody in the car?


 A. [MARSH]: I could see two persons was in front of the car.


 Q. Where were they in the car?


 A. I think they was in the front seat of the car.


 Q. Was there somebody in the driver's side?


 A. There was a driver and-driver on one side and someone on the other side.


 Q. Both in the front seat?


 A. Both was in the front seat.


 Q. Are you sure now-this is important-that neither of the two people in the front seat
are the people who came through the window?


 A. No, sir, they didn't come out the car, from what I see, they didn't move from the
car. They were still in the car.


 Q. So, as far as you could tell, when the person came through the window there were
still two people in the front seat?


 A. In the car, yes, sir.


 In his brief, appellant merely lists 65 claimed deficiencies in the testimony of various
witnesses and asserts without explanation or argument that these deficiencies greatly outweigh the
evidence of his guilt. He claims that after conducting a factual sufficiency review, "this Court will
conclude that the jury verdict is so contrary to the overwhelming weight of the evidence as to be
clearly wrong and unjust."

 This Court has adjusted a direct appellate court's power to review the evidence for factual
sufficiency "in line with civil practice." See Watson v. State, S.W.3d slip op. at 21
(Tex.Cr.App. No. PD-469-05, delivered October 18, 2006). Evidence, that rationally supports a
verdict of guilt beyond a reasonable doubt under the Jackson v. Virginia legally sufficiency
standard, (5) can still be factually insufficient when the verdict "seems clearly wrong or manifestly
unjust" or "against the great weight and preponderance of the evidence." See Watson, slip op. at 21
(internal quotes omitted). The legal and factual sufficiency standards both require the reviewing
court to consider all of the evidence. See Watson, slip op. at 20-21. The difference between the two
standards is that the former requires the reviewing court to defer to the jury's credibility and weight
determinations while the latter permits the reviewing court to substitute its judgment for the jury's
on these questions "albeit to a very limited degree." See Watson, slip op. at 22, 25; see also Johnson
v. State, 23 S.W.3d 1, 9 (Tex.Cr.App. 2000) (factual-sufficiency review requires reviewing court to
afford "due deference" to a jury's determinations); Clewis v. State, 922 S.W.2d 126, 135
(Tex.Cr.App. 1996) (factual-sufficiency review requires "deferential standards of review applied"
to jury verdicts). A factual-sufficiency review is "barely distinguishable" from a Jackson v. Virginia
legal sufficiency review. See Watson, slip op. at 22-23; In re King's Estate, 244 S.W.2d 660, 662
(1952) (not simple to describe the intellectual process to be followed by the reviewing court "to
specify just how a verdict may be supported by evidence of probative force and at the same time be
on all the evidence clearly unjust").

 We decide that the evidence is factually sufficient to support a finding that appellant shot and
killed the victim. Two witnesses-Calliham and Green-provided testimony that supports this finding. 
The jury was in the best position to evaluate the credibility of these witnesses, and our factual-sufficiency jurisprudence still requires an appellate court to afford "due deference" to the jury's
determinations. See Johnson, 23 S.W.3d at 9 (factual-sufficiency review requires reviewing court
to afford "due deference" to jury's determinations); see also Watson, slip op. at 25 (very nature of
factual-sufficiency review allows reviewing court to sit as thirteenth juror "albeit to a very limited
degree"); Clewis, 922 S.W.2d at 135..

 More importantly, both Calliham and Marsh testified that when the car pulled up to the drive-through window, there was only one person in the back seat and that this was the person who came
through the drive-through window and the only person who went inside the Whataburger. It is
significant that appellant corroborated this testimony in his second statement to the police by placing
only himself in the back seat of the car that pulled up to the drive-through window and by also saying
that only one person went inside the Whataburger. It is also significant that Marsh (who heard the
assailant tell the victim to open the back door and who also heard the assailant tell the victim to
produce the key to the safe just before he shot the victim) testified that "the person who shot [the
victim] was the same person [he] saw come through the window." (6) Other evidence was presented
placing a gun, similar to the one used to kill the victim, in appellant's possession before and after
the offense. The evidence is factually sufficient to support a finding that appellant himself shot and
killed the victim. On this record, we cannot conclude that the jury's verdict seems clearly wrong and
manifestly unjust or against the great weight and preponderance of the evidence. See Watson, slip
op. at 21. Point of error three is overruled.

 In point of error one, appellant claims that Article 37.071, Tex. Code Crim. Proc., is
unconstitutional under Apprendi v. New Jersey, 530 U.S. 466 (2000), because Article 37.071 does
not require the State to prove insufficient mitigating circumstances beyond a reasonable doubt. In
point of error two, appellant makes a related claim that Article 37.071 is unconstitutional because
it places the burden on the defense to prove that there are mitigating circumstances to warrant a
sentence less than death. This Court has resolved these claims adversely to appellant. See Perry v.
State, 158 S.W.3d 438, 446-48 (Tex.Cr.App. 2004), cert. denied, 126 S.Ct. 416 (2005); Blue v. State,
125 S.W.3d 491, 500-01 (Tex.Cr.App. 2003); cert. denied, 543 U.S. 853 (2004). Points of error one
and two are overruled.

 In points of error four and five, appellant claims that the trial court erroneously admitted into
evidence his second statement to the police because there was no valid waiver of his right to remain
silent (point four) and because it was made in response to a false promise from Scales that appellant
would be charged only with aggravated robbery (point five). The record reflects that appellant
initially told the police in response to police-initiated questioning that he was not involved in the
offense. Appellant later re-initiated contact with the police through his girlfriend Watts and gave
his second statement to the police (Scales) because he wanted to tell his "side of the story."

 The transcript of this appellant-initiated interview with Scales reflects that appellant
answered "no sir" when Scales first asked him if he wanted to waive his rights. Scales immediately
asked the question again and appellant responded "yes sir" (that he wished to waive his rights).

 Q. [SCALES]: Ok. Um, we're here in reference to a homicide that occurred at 1718
West Loop North at the What-A-Burger on the 11th of May 2003. [Appellant], I'm
going to read you your rights again. We've talked to you recently . . . uh, you had
called [Woods] your girlfriend, is that correct?


 A. [APPELLANT]: (inaudible)


 Q. And she called me and said that you wanted to re-initiate another interview. Is
that correct?


 A. (inaudible)


 Q. Ok, you have to speak up cause it's all recorded. All right, so you re-initiated the
second interview and here we are, is that correct?


 A. Yes, sir.


 Q. Ok, through your girlfriend [Woods]. Is that correct?


 A. Yes sir.


 Q. Ok. I'm going to read your rights to you one at a time. You have the right to
remain silent not make any statement at all. And any statement you make may be
used against you and probably will be used against you at your trial. Do you
understand this right?


 A. Yes sir.


 Q. Any statement you make may be used as evidence against you in court, do you
understand this right?


 A. Yes sir.

* * *

 Q. Ok, do you voluntarily waive your rights and agree to talk to us again?


 A. No sir.


 Q. No, the question is, do you voluntarily, on your own free will, waive your rights
and agree to talk to us?


 A. Yes sir.


 Q. OK, yeah, so you said no, but you didn't understand the question. So, I'll restate
it one more time. You re-initiated the interview . . . .


 A. Yeah.


 Q. Because you talked to [Woods], cause you want to tell us your side of the story.


 A. Yeah.


 Q. Ok, so I want to ask you one more time to clear it up. Do you voluntarily, on your
own free will, agree to waive your rights and talk to us? You have to say yes.


 A. Yes sir.


 Q. Ok, alright. OK. So you called [Woods], whom I've interviewed, and, uh, you wanted
to tell your side of the story about the events of May 11th at the What-A-Burger.


 A. Yes sir.


 Scales testified at the suppression hearing that he never promised appellant that he would be
charged only with aggravated robbery. Scales also testified at the suppression hearing that, after
appellant's initial response of "no sir" to the question of whether appellant wanted to waive his
rights, he continued questioning appellant for the purpose of clarifying whether appellant really
wanted to waive his rights since it was appellant who re-initiated the police interview.

 Q. [DEFENSE]: And after having just read him all of his rights, you said, Okay, do
you voluntarily waive your rights and agree to talk to us again; do you not?


 A. [SCALES]: M-h'm.


 Q. And what was his response?


 A. No, sir.


 Q. And why did you not terminate the interview at that point in time?


 A. Well, he contacted us to talk to us. So, I restated the question again to make sure
he understood.


 Q. And did you make some type of assumption that he was not invoking his rights
because of that?


 A. No, I don't think so, because he contacted us to reinitiate the interview.


 Q. You understand he has a right to change his mind at any time; do you not?


 A. Correct.


 Q. How did you know that he was not just changing his mind about wanting to talk
to you when he said, No, sir, in answer-when you asked him if he wanted to
voluntarily waive his rights?


 A. That's why I asked him again, to make sure that was true.


 Q. When you-do you know what your function becomes should a person refuse to
voluntarily waive his rights?


 A. Yes.


 Q. What are you supposed to do?


 A. Stop the interview, if that's what they really want to do, yeah.


 Q. You asked him a simple question and he gave you a direct answer when he said,
No, sir; did he not?


 A. I asked him again to make sure that he understood what I was asking. We do that,
yes.


 The record supports a finding that Scales did not promise appellant that he would be charged
only with aggravated robbery. In addition, federal constitutional law does not prohibit the police
from clarifying whether an arrestee wishes to waive his rights under circumstances like those here. 
Assuming that appellant unambiguously invoked his right to remain silent, Scales did not proceed
to question appellant regarding the offense. Cf. Davis v. United States, 512 U.S. 450, 458 (1994)
(suspect who has unambiguously invoked his right to counsel cannot be questioned "regarding the
offense" unless an attorney is present); see Dowthitt v. State, 931 S.W.2d 244, 257 (Tex.Cr.App.
1996) (police must cut off questioning when accused unambiguously invokes right to remain silent).

 In addition, under the circumstances here where appellant re-initiated contact with the police
to tell his side of the story, the trial court could reasonably have found that any invocation by
appellant of his right to remain silent was ambiguous thereby permitting Scales either to continue
questioning "regarding the offense" or to stop this questioning and clarify whether appellant really
wanted to remain silent. Cf. Davis, 512 U.S. at 459 (suspect must invoke his right to counsel
"sufficiently clearly that a reasonable police officer in the circumstances would understand the
statement to be a request for an attorney") and at 461-62 (when suspect makes ambiguous request
for counsel, police may, but are not required, to clarify whether he actually wants an attorney);
Dowthitt, 931 S.W.2d at 257. Points of error four and five are overruled.

 In point of error six, appellant claims that the trial court erroneously denied his motion for
a mistrial when the jury heard extraneous offense evidence at the guilt-phase of trial. Woods
testified at the guilt-phase that she and appellant started "disagreeing" when appellant told her "that
he was going to start robbing." The trial court denied appellant's motion for a mistrial after
instructing the jury to disregard this remark.

 Q. [STATE]: When did you-all start disagreeing?


 A. [WOODS]: When he start telling me that he was going to start robbing-


 [DEFENSE]: Your Honor, I object to that as an extraneous offense.


 [THE COURT]: Sustained as to the form of the question.


 [STATE]: I am talking specifically about the Whataburger case that we are talking
about?


 [DEFENSE]: Before we go any further, Judge, I also ask that the jury-the Court
instruct the jury to disregard.


 [THE COURT]: The jury will disregard the last response of the witness.


 [DEFENSE]: And I would also ask for a mistrial, Your Honor.


 [THE COURT]: That's denied.


 Woods then testified without objection that appellant told her about four days before the
offense that he planned to rob the Whataburger involved in this offense. Woods also testified
without objection that appellant told her that he planned to rob three Whataburgers. Assuming that
Woods' complained-of testimony about appellant's plan "to start robbing" was a reference to an
extraneous offense, the trial court's instruction to disregard was sufficient to cure any harm or
prejudice from this event. See Young v. State, 137 S.W.3d 65, 69-70 (Tex.Cr.App. 2004) (mistrial
not required where prejudice is curable by instruction to disregard); Ovalle v. State, 13 S.W.3d 774,
783 (Tex.Cr.App. 2000) (instruction to disregard usually cures prejudice from reference to
extraneous offense). Point of error six is overruled.

 In point of error seven, appellant claims that he was denied his Sixth Amendment right of
confrontation under Crawford v. Washington, 541 U.S. 36 (2004), when the trial court allowed "a
different medical examiner other than the one who actually performed the [victim's] autopsy and
who wrote the [autopsy] report to testify against the appellant at trial." The record reflects that Dr.
Lester performed the victim's autopsy under the supervision of Dr. Narula. At the time of
appellant's trial, Dr. Lester was working in Memphis and Dr. Narula was retired.

 The State called Dr. Milton to testify about the victim's cause of death based on Dr. Lester's
autopsy report (State's Exhibit 69). After the State laid the predicate for the admission of the
autopsy report as a business record, the defense requested a hearing outside the jury's presence. This
hearing centered on appellant's objections to various autopsy photographs that the State intended to
introduce into evidence. At the conclusion of this hearing, the defense offered to stipulate to the
victim's cause of death and it also objected that it was "being denied an opportunity to cross-examine
the real witness" under Crawford.

 [DEFENSE]: Your Honor, at this time we would offer to stipulate that the [victim]
died of a penetrating gunshot wound of the head, close-range type, and to the
description of both the external and internal examination, which should be sufficient.


 [STATE]: We choose not to stipulate, Your Honor.


 [THE COURT]: All right. Your objection to the report? Do you have an objection 
to the report?


 [DEFENSE]: No, Your Honor.


 [THE COURT]: Okay. State's Exhibit 69 is admitted as well.


 [DEFENSE]: Yes, we do, Judge. One quick one under Crawford v. State (sic), we
are objecting that we are not-being denied an opportunity to cross-examine the real
witness-Crawford v. Washington.


 [THE COURT]: So noted. Overruled.


 We decide that any constitutional error in admitting the victim's autopsy report was harmless
beyond a reasonable doubt because there was no factual dispute about the victim's cause of death
with appellant even offering to stipulate to this. See Tex. R. App. Proc. 44.2(a) (appellate court
must reverse a judgment based on constitutional error unless the appellate court determines beyond
a reasonable doubt that the error did not contribute to the conviction or punishment). We also note
that the victim's autopsy report had no bearing on the central issue in the case which was whether
appellant was the one who shot the victim. Point of error seven is overruled.

 In point of error eight, appellant claims that the trial court erroneously permitted the State to
introduce Worthy's out-of-court statement to a county jail inmate (Meyer) that Worthy was not the
shooter. As part of its case, the defense presented the testimony of county jail inmate Meyer. Meyer
testified on direct examination by the defense that he assisted Calliham and Worthy in preparing
affidavits stating that Calliham had no involvement in the offense and that Worthy was involved in
the robbery but not the shooting.

 Q. [DEFENSE]: First of all, [Calliham and Worthy], they always blamed everything
on [appellant]; right? The shooting?


 A. [MEYER]: They blame [sic] the shooting on [appellant], yes, sir.


 Q. And they claimed that they had nothing to do with this robbery and did not know
it was even going to occur in their affidavits; isn't that correct?


 A. I believe [Calliham] claimed this by himself.


 Q. That what?


 A. That [Calliham] claimed that he didn't know that was going on, that there was a
robbery; [Worthy] didn't claim that.


 Q. [Worthy] what now?


 A. [Worthy] didn't claim that he didn't know it.


 Q. That's what I said. They both said they didn't know, right, that a robbery was
going to occur?


 A. [Worthy] knew a robbery was going to occur.


 Meyer also testified on direct examination by the defense that some people in jail look for
information to sell and that Calliham and Worthy "always blamed everything on [appellant], the
shooting, the robbery."

 Q. [DEFENSE]: And there are people who look for information in the jail so they can
sell it; right?


 A. [MEYER]: I mean that's a-that would be a possibility.

* * * 

 Q. [DEFENSE]: And no question they do to you-at least they always blamed
everything on [appellant], the shooting, the robbery, him being covered in
blood?-They I am talking about, Calliham and Worthy?


 A. [MEYER]: That's correct.


 On cross-examination by the State, Meyer testified over appellant's hearsay objections that
Worthy "in no way, shape or form, cleared himself" in the affidavit that Meyer helped Worthy
prepare.

 Q. [STATE]: Worthy, in no way, shape or form, cleared himself. He's basically
confessing to capital murder in these affidavits; isn't he?


 A. [DEFENSE]: Object to him-to this as hearsay, Your Honor.


 [THE COURT]: Overruled.


 Q. I mean, isn't he-he's saying I am part of a capital murder, but I am not the shooter,
right?


 [DEFENSE]: Objection to hearsay and leading.


 [STATE]: This is cross-examination.


 [DEFENSE]: This is not cross-examination.


 [THE COURT]: It is overruled.


 Q. Isn't that right?


 A. Yes, sir.


 Q. He's saying I was a part of a plan to do an inside robbery at a Whataburger that
went crazy and that defendant shot somebody; right?


 A. That's correct, sir.

 

 Appellant claims that the trial court erroneously admitted Worthy's out-of-court statement
to Meyer that Worthy was not the shooter. The State claims, among other things, that appellant
opened the door to this evidence through its direct examination of Meyer that Worthy "blamed
everything" on appellant and that the State could properly respond to this on cross-examination of
Meyer with Worthy's out-of-court statement to Meyer that Worthy did not "blame everything" on
appellant by taking some responsibility for the robbery but not the shooting.

 We decide that any error in the admission of the complained-of evidence was harmless since
the portions of the record set out above also indicate that appellant brought out essentially the same
evidence during his direct examination of Meyer. See Leday v. State, 983 S.W.2d 713, 716-18
(Tex.Cr.App. 1998) (improper admission of evidence is harmless when other such evidence is
admitted without objection). Point of error eight is overruled.

 In point of error nine, appellant claims that the "trial court erred in refusing to admit
testimonial evidence in the form of an excited utterance which supported appellant's defense." The
record reflects that the trial court disallowed appellant from questioning officer Moreno about a
report prepared by another officer (Triplett). Appellant claimed that the out-of-court statements in
this report showed that the murder weapon in the Whataburger offense was used about two weeks
before in another offense by some unknown person at an apartment complex where Worthy lived. 
The State made hearsay and relevancy objections to the admission of this evidence. The trial court
excluded this evidence ruling that its probative value was substantially outweighed by the danger of
unfair prejudice or confusion of the issues. We set out relevant portions of the record.

 [DEFENSE LAWYER #1]: A brief summary of the event, Judge, would be-and I
need to turn the page over here for these addresses.


 On May the 27th of '03, which would be two weeks to the date.


 [DEFENSE LAWYER #2]: April 27th.


 [DEFENSE LAWYER #1]: Sorry. April 27th, two weeks prior to this offense, there
was a shooting that occurred at 13503 Northborough. That shooting involved a
lady-two ladies and a man who were in a car. They were driving through the parking
lot of that apartment complex. Someone that they knew and had problems with
before confronted them. They had an argument. This person took a pistol, broke the
window out of that vehicle, at which time they began to drive off and this person
fired a number of shots into the back of the car.


 [THE COURT]: Okay.


 [DEFENSE LAWYER #1]: Those people left that scene, went to wherever they live,
which I don't remember, but.


 [DEFENSE LAWYER #2]: In the 1300 block at Northborough.


 [DEFENSE LAWYER #1]: It was not-it was in a place Afton something.


 [DEFENSE LAWYER #2]: Okay, what-


 [THE COURT]: Those complainants.


 [DEFENSE LAWYER #1]: Those complainants went and called the police and
Officer Triplett came out to the scene. He viewed the car, saw four, five bullet holes
in the car. He recovered some slugs, some spent bullets from the back vehicle of that
car. Since-those were taken to the ballistics lab and the ballistics lab says those spent
bullets were fired by the same weapon as the spent bullets that killed [the victim in
this case], so, i.e., that gun is the gun used-


 [THE COURT]: Okay.


 [DEFENSE LAWYER #1]: -in the robbery. The description that these ladies were
able to give was a nickname of Damon or Damiano. They described him as being
five eleven to six foot, 140 pounds, 150.


 [DEFENSE LAWYER #2]: Afro and a goatee.


 [DEFENSE LAWYER #1]: Afro. Goatee. And they knew what apartment project
he lived in. And he lived at 12803 Northborough, which is where [appellant]-I am
sorry, where [Worthy] lived.


 [THE COURT]: So, let me stop you for a second. The shooters know the name of-I
am sorry, the complainants know the name of the shooters, a nickname, and they
know that he lives at an apartment complex where Worthy lives?


 [DEFENSE LAWYER #1]: Right.


 [THE COURT]: Okay. Go ahead.


 [DEFENSE LAWYER #1]: And that it is our position that the description they gave
of him also fits Worthy.


 [STATE]: But how in the world could this possibly be outside the ambit of hearsay?


 [DEFENSE LAWYER #2]: Because-and I researched the law on this-I believe that
[Moreno] can testify that they were in the grip of the excitement after this shooting
and I have case law right on point. And in it statements-


 [STATE]: How would [Moreno] know unless he was there to speak with them? He
is going to say, third hand, he is going to say excited utterance.


 [DEFENSE LAWYER #2]: Not necessarily on officer-


 [STATE]: He is not the responding officer.


 [DEFENSE LAWYER #1]: We can get Triplett.


 [THE COURT]: Okay.


 [DEFENSE LAWYER #1]: Hope to get it in through [Moreno], because he knows
about-I read the report and he-


 [STATE]: Right now, start getting Officer Triplett in, even though this is your
defense.


 [DEFENSE LAWYER #1]: Let's get a ruling.


 [THE COURT]: My question is, How is the fact that these people who gave a
description that could fit Worthy are [sic] relevant to this case?


 [DEFENSE LAWYER #2]: For one reason, Your Honor. It shows that the gun was
in the possession of someone other than [appellant] at a point two weeks prior to this
offense.


 There has been testimony that [appellant] had this silver pistol. That's been disputed
both through the testimony from [Calliham] and so forth. This puts the pistol in
someone else's hand.


 [THE COURT]: Okay.


 [DEFENSE LAWYER #2]: I would urge that it would go to the weight of the
evidence, the relevance versus admissibility, up to the jury to give whatever weight. 
But the fact is it makes a-the description that was given by these complainants, afro,
goatee, I believe it was dark complexion, looks just like-sounds just like this
mugshot of [Worthy].


 [STATE]: Judge, if I could just say two things. First of all, [appellant] admits the
pistol was in his lap that day and admits that it was in his hand according to him
before the capital murder. So, [sic] could have easily passed it to Worthy, if they
believe his story, that Worthy was the one who was the shooter. Besides, this is
going to bring that Shipley's extraneous robbery,[ (7)] we have a photograph of him
holding a shiny pistol an hour and 15 minutes after the capital murder.


 [DEFENSE LAWYER #1]: A shiny pistol, but not the pistol.


 [STATE]: Says there is two pistols, one shiny, one dark. So, the jury will infer if is
the murder pistol in his hands an hour and 15 minutes earlier.


 [THE COURT]: Let me make sure that I understand what I'm hearing.


 You want to offer evidence that someone else had the pistol other than [appellant]
two weeks before the shooting?


 [DEFENSE LAWYER #1]: That fit the description of Worthy, lives where Worthy
lives and is willing to shoot at people.


 [STATE]: It doesn't fit the description of Worthy necessarily and we don't know
what stage of the hairdo that [appellant] had two weeks before and booking photo for
[Worthy] says he is six one, 185. [Appellant] describes Worthy as being six one and
about 200.


 So, the fact that these suspects-or these complainants said that the suspect was 140
pounds does not match [Worthy's] description. We don't know what [Worthy's] hair
was like two weeks before. We don't know what [appellant's] hair was like two
weeks before. And his name is Damon. The name Damon has never been attributed
to Worthy or to [appellant].


 [THE COURT]: Okay. What else do you-all have to say about it? Anything else?


 [DEFENSE LAWYER #1]: Do you have any questions? I mean, I don't know what
else to say.


 [THE COURT]: Okay. I just want to make sure you have got everything that you
want to tell me. Okay.


 I am going to find that the probative value is substantially outweighed by the danger
of unfair prejudice or confusion of the issues and exclude that offer.

 

 Appellant argues that the excluded evidence was admissible as an excited utterance under
Tex. R. Evid. 803(2). The State argues:

 In the present case, the appellant was attempting to put on evidence of the extraneous
shooting through the testimony of Moreno; however, Moreno was not the actual
declarant of the statements related to the shooting. In fact, Moreno never actually
spoke to any of the declarants of the statements related to the shooting; he merely
read the statements as reflected in a police report written by another officer. Thus,
the appellant's intended evidence constituted hearsay within hearsay.


 The trial court would not have abused its discretion to agree with the State's claim at the
hearing on the admissibility of this evidence that, since Triplett talked to the people involved and
prepared the report, Moreno could not have provided testimony to establish the predicate for the
admissibility of the evidence under the excited utterance exception to the hearsay rule. We cannot
conclude that the trial court abused its discretion to exclude double hearsay testimony that an
unknown person, maybe fitting Worthy's description, used the murder weapon about two weeks
before this offense. Point of error nine is overruled.

 In point of error ten, appellant claims that the trial court erroneously denied his "motion for
mistrial after the State failed to correct false testimony." The record reflects that Calliham testified
on direct examination by the State that he did not know about a plan to commit a robbery at the
Whataburger. Meyer later testified on direct examination by the defense that he believed that
Calliham knew about a plan to commit this robbery because Calliham told Meyer that appellant and
Worthy divided up the guns before going to the Whataburger.

 Q. [DEFENSE]: From your conversation with [Calliham], did [Calliham] ever
indicate to you, in his conversation, that he knew the robbery was going to occur and
that he knew that [Love]-well, you didn't know names, but someone on the inside
was in on the robbery?


 A. [MEYER]: [Calliham]? No.


 Q. He did not?


 A. (Shakes head.)


 Q. When you-did he indicate to you that there was, verbally, that there was some
type of plan to rob the Whataburger well before they-that he knew about, well before
they got to the Whataburger?


 A. Are you speaking of [Calliham]?


 Q. Yes. [Calliham].


 A. No, [Calliham] didn't say-


 Q. Okay. So, the only thing that leads you to believe that [Calliham] knew about it
was the fact that they stopped prior to they [sic] got to Whataburger and divided up
the guns?


 A. Yes, sir.

 

 The defense later requested a mistrial "for the State's knowing failure to correct [Calliham's]
perjured testimony." The defense claimed that, when Calliham testified on direct examination by
the State that he did not know about a plan to commit a robbery at the Whataburger, the State knew
what Calliham had told Meyer about appellant and Worthy dividing up the guns before going to the
Whataburger. (8) The trial court denied the defense request for a mistrial.

 [DEFENSE]: Your Honor, along with our motion for mistrial, we would come now,
the [appellant], by and through his attorney of record and we would request that the
Court grant a mistrial in this matter for the State's knowing failure to correct perjured
testimony.


 And by that I have reference to their witness [Calliham] testifying that he knew
absolutely nothing about the robbery; that he did that as a result of their agreement
or an agreement with the State of Texas.


 He testified-and the State of Texas knew at the time what [Meyer] would say about
[Calliham's] testimony. I believe that they knowingly failed to correct the perjured
testimony of [Calliham]. For that reason we would ask for a mistrial.


 [THE COURT]: It is denied.

 

 Appellant argues on appeal that the State's failure to timely reveal Meyer's information
before Calliham testified prevented him from using this information to effectively cross-examine
Calliham about his prior knowledge of the robbery. He claims that this "gave the jury a false
impression of Calliham's participation in the robbery, and this false impression should have been
corrected so that the jury could properly weigh Calliham's credibility."

 The record, however, reflects that the jury "could properly weigh Calliham's credibility." 
The jury learned through Meyer that Calliham may have known about the planned robbery at the
Whataburger. The State even told the jury during closing arguments that it did not believe
Calliham's claim that he did not know about this planned robbery.

 [STATE]: What is our evidence on [Calliham]? First of all, [Calliham] says that he
was not at all involved in the planning of the Whataburger robbery. He says that he
was just going there to have a hamburger and get something to eat from the
way-from one club to the other club.


 Now, it should be fairly obvious to all of us that we do not believe that. Certainly,
we do not believe that. We did not dismiss his case. We gave him a deal. That's
certainly so. But we do not believe that [Calliham] did not know a robbery was
going down. That's why we have charged him the way that we have. And that's why
we will pay and plead guilty-plead no contest to an aggravated robbery.

 

 This record reflects that it was "fairly obvious to all" that Calliham's claim of ignorance
about the planned robbery was not believable. On this record, appellant could not have suffered any
harm from any failure by the State "to correct false testimony." Point of error ten is overruled.

 In point of error eleven, appellant claims that the trial court erroneously denied his "motion
for mistrial during the punishment phase of the trial based on the State's failure to provide
exculpatory evidence to the defense" in violation of Brady v. Maryland, 373 U.S. 83 (1963). The
State presented punishment evidence that appellant misbehaved while in the county jail awaiting trial
for this offense.

 One inmate (Dixon) testified on direct examination by the State that he saw appellant and
another inmate assault a Hispanic inmate who was trying to break up a fight among other inmates. 
Dixon testified on cross-examination that he believed this inmate's name was "Cordona" or
"[s]omething like that." The defense later called an inmate named Cadena who testified on direct
examination that appellant did not assault him and that appellant helped stop the fight among the
other inmates.

 Appellant later unsuccessfully moved for a mistrial because the State did not disclose this
evidence. The State responded that it did not know that Cadena was the inmate allegedly struck by
appellant:

 [STATE]: Today is Thursday. The previous Friday is my first opportunity to speak
with Mr. Cadena. He is somebody I subpoenaed some six weeks ago, along with
everyone else that was involved in the fight that was written up by the jail back in
June of 2004.


 mr. [sic] Cadena did not speak English and I do not speak Spanish. I showed him a
picture of [appellant] and tried to describe whether or not he was involved in a fight,
whether or not [appellant] was involved in a fight and whether or not he was
involved in a fight. And he indicated to me that neither one of them were.


 I didn't at that point know that he had been-had been named as the complainant in
the fight. It wasn't clear to me at all that he was a complainant in the fight, just that
he was involved in the fight.


 When I learned that he was not going to say that he or [appellant] were involved in
a fight, I didn't want to call him to the witness stand. And it wasn't until Mr. Dixon
testified and then his-this testimony was elicited from the Defense that Mr. Cadena
was, in fact, the complainant and, of course, as Mr. Dixon testified, my first
conversation with him was either the day of his testimony, which would have been
Tuesday-I am sorry, which would have been Wednesday or the day before which was
Tuesday. I don't recall which one it is. I did not know until he testified, the
substance of his testimony regarding [appellant] alleged to have struck Mr. Cadena. 
And I don't even think it was clear that Dixon knew what his name was. And I still
don't think it is clear exactly who [appellant] struck, whether it was Mr. Cadena or
not.


 There were several people involved in the fight. It was described as a near riot. And
so at the time that I interviewed Mr. Cadena this past Friday I wasn't aware of that
information.


 We decide that any Brady violation was harmless primarily because the record reflects that
appellant was, in fact, able to present to the jury the evidence that he claims the State failed to
disclose in violation of Brady. Cf. Hampton v. State, 86 S.W.3d 603, 612 n.26 (Tex.Cr.App. 2002)
(when issue is failure to timely disclose Brady material, defendant must show that, had timely
disclosure been made, there is a reasonable probability that the result of the proceeding would have
been different). Point of error eleven is overruled.

 In point of error twelve, appellant claims that the trial court erroneously denied his "motion
for mistrial during the punishment phase of the trial after the State's witness gave testimony in the
form of irrelevant speculation." The record reflects that a county jailer testified on direct
examination by the State that she had to remove a county jail inmate (Gonzales) from an area of the
county jail (a "tank") where he was being housed because appellant and some of the other inmates
were "extorting inmate Gonzales for his tennis shoes." Miller testified that she prepared a report
describing appellant's involvement in this incident.

 Q. [STATE]: What eventually happened?


 Was anybody charged with anything?


 A. [MILLER]: Yes, ma'am. In this particular case I wrote up [appellant] because he
struck the other inmate. However, behind him striking the inmate was because him
and a couple of other inmates were extorting inmate Gonzales for his tennis shoes. 
They wanted his shoes.


 Miller later testified that Gonzales would have been beaten badly had he been returned to that
tank. The trial court denied appellant's motion for a mistrial after it instructed the jury to disregard
this remark.

 Q. [STATE]: Why did you write up the report?


 A. [MILLER]: Because if inmate Gonzales would have been returned to that tank,
he would have been beaten badly. There is no telling what could happen to him. 
There would definitely be physical harm. There was already physical harm to him.


 [DEFENSE]: Your Honor, I would object to the last part of the answer, where she
is speculating that there would definitely be physical harm.[ (9)]


 [THE COURT]: Sustained.


 [DEFENSE]: Thank you.


 Q. [STATE]: What is your experience?


 [DEFENSE]: Ask that that the jury be instructed to disregard.


 [THE COURT]: Jury disregard the last remark of the witness.


 [DEFENSE]: Ask for a mistrial.


 [THE COURT]: It's denied.


 On this record, we decide that the trial court's instruction to disregard cured any harm or
prejudice from the objected-to remark. See Young, 137 S.W.3d at 69-70. Point of error twelve is
overruled.

 In point of error thirteen, appellant claims that the trial court erroneously denied his motion
for new trial "based on violations of [Brady]; the court's discovery order; the court's order on
[appellant's] pre-trial motion for disclosure of detailed exculpatory evidence; [appellant's] motion
to discover arrest and convictions records of witnesses, and the Court's order requiring State to
reveal agreements." The record reflects that appellant filed a motion for new trial with a supporting
affidavit. The State filed an affidavit controverting the allegations in appellant's affidavit. The trial
court denied appellant's motion for new trial after admitting these affidavits and another affidavit
that the defense offered at the hearing. On this record, we cannot conclude that the trial court abused
its discretion to deny appellant's motion for new trial. Point of error thirteen is overruled. (10)

 The judgment of the trial court is affirmed.

 Hervey, J.

Delivered: December 20, 2006

Publish

1. After counsel filed a brief on appellant's behalf, appellant filed a pro se brief raising seven
points of error. We will not address these points as appellant has no right to hybrid representation. 
See Scheanette v. State, 144 S.W.3d 503, 505 n.2 (Tex.Cr.App. 2004), cert. denied, 543 U.S. 1059 
(2005).
2. The record does not clearly reflect how the assailant and the victim reentered the
Whataburger (assuming they even left the Whataburger through the back door). The State's brief
asserts that the assailant "brought [the victim] back inside" the Whataburger. Appellant's brief
asserts that "Marsh recalled [the victim] somehow getting back inside and hearing a man tell [the
victim] that he would kill him if he did not give him the key to the safe." Marsh testified on direct
examination that the assailant and the victim had to have come back inside the Whataburger through
the side door by the drive-through window even though the evidence showed that door was locked. 
Marsh testified on cross-examination that it was possible that another person could have entered the
Whataburger through the drive-through window and let the assailant and the victim back inside
through the back door. The evidence seems to more easily support a finding that the assailant and
the victim were never locked out of the Whataburger and that the assailant, possibly with the help
of another person, got the victim to open the back door and come back inside the Whataburger. The
evidence does not necessarily have to show how the assailant and the victim may have reentered the
Whataburger to withstand a factual sufficiency challenge. 
3. The record reflects that appellant shaved his head soon after his arrest.
4. Appellant told Scales:


 Ok. He, um, he gets the guns and stuff. We go to the What-A-Burger and um,
[Worthy] jumped through the window at What-A-Burger, right. He in the What-A-Burger and I see the people running to the back of it, so I run to the back of it. So,
the man was still stuck in the What-A-Burger that got shot. He was in the What-A-Burger with [Worthy], but people had ran. They ran and they left, so I'm coming
around the What-A-Burger by the drive-thru, and um, [Calliham] going around the
parking lot and then, that's when I heard the gunshot cause I guess he shot him inside
the What-A-Burger. Then that's when I heard the gunshot. Then that's when he
pulled up and then we got in the car and left. That's all I saw. I didn't see him shoot
him or nothing.
5. See Jackson v. Virginia, 443 U.S. 307, 319, 326 (1979).
6. It also would not have been contrary to the weight of the evidence for the jury to have found
that it was Worthy and not appellant (as appellant claimed in his second statement to the police) who
watched the back door and that Worthy facilitated appellant and the victim coming back inside the
Whataburger through the back door just before appellant shot and killed the victim. 
7. Evidence was presented at the punishment phase that appellant, Calliham and Worthy were
involved in a robbery at a Shipley's donut shop about an hour after the Whataburger offense. A
Shipley's employee testified that a car with three people in it pulled up in front of the shop. 
Appellant got out of the car and robbed her. He threatened her with a silver pistol during the
Shipley's robbery.
8. The State responded that Meyer's information concerning Calliham's statement to Meyer
about dividing up the guns was available to the defense before "he" (apparently Calliham) took the
witness stand. The defense responded that this did not "obviate their duty to not knowingly present
perjured testimony."
9. The record, therefore, reflects that appellant did not object to the first part of the answer that
Gonzales "would have been beaten badly. There is no telling what could happen to him."
10. In his brief, appellant primarily complains that: 1) the State did not timely disclose
Calliham's statement to Meyer "about the individuals dividing up the guns before they all went to
the Whataburger" (see point of error ten), and 2) the State did not disclose that it had made a deal
with Calliham until several days into voir dire. Appellant's brief asserts:


 Appellant's counsel testified about how this lack of disclosure harmed appellant. He
stated that a different trial strategy would have been employed had he been given
proper notice of this information by the prosecution, including cross-examining
[Calliham] regarding the event of stopping and obtaining weapons and passing them
out. Other witnesses would have been questioned about this event as well. Armed
with this valuable information ahead of time, appellant's counsel would have
included additional questions of the prospective jurors during individual jury
selection. (References to Motion for New Trial omitted). Appellant's counsel
testified (in response to the State's opposing affidavit at the motion for new trial
hearing) that he was never informed that [Calliham] was not admitting his guilt prior
to the time Calliham testified. (References to Motion for New Trial omitted).


 The record, however, reflects that appellant was able to present all of this information to the
jury and that he effectively cross-examined Calliham with various matters from which the jury could
have concluded that he was not worthy of belief. Appellant does not specify how any non-timely
disclosure of this information affected his voir dire of prospective jurors.