NO. 07-06-0465-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

JANUARY 4, 2008

_____

JUAN DE LA CRUZ, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 137TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 88-407,845; HONORABLE CECIL G. PURYEAR, JUDGE

_____

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

**MEMORANDUM OPINION**

This is an out-of-time appeal conducted at the direction of the Texas Court of Criminal Appeals. In 1990, Appellant, Juan De La Cruz, was convicted by a jury of aggravated sexual assault and punishment was assessed by the trial court at thirty years

confinement.  Presenting a sole issue, Appellant contends the evidence presented during the guilt-innocence phase of the trial was factually insufficient.  We affirm.

**Background**

According to the victim, who is Appellant's stepdaughter, she was sexually assaulted by Appellant on Saturday, February 20, 1988.  She was eleven years old at the time.  She testified that while she and her eight-year-old sister were watching television in the living room and her mother was at work and other siblings were not in the house, Appellant called her to his bedroom, closed the door, and placed a chair under the doorknob.  He then asked her to undress, which she refused to do.  Appellant then pulled her pants and panties down around her knees and instructed her to lay down on the bed.  He pulled his pants and underwear down to his knees and according to the victim, he held his "private part" and rubbed it against her private part.  The victim testified that following the incident, Appellant cleaned her and himself and she dressed herself and returned to the living room.

The following Thursday, the victim intended to run away from home but told her sister she would be staying after school for tutoring.  She encountered her friend Tabitha, whom she was not supposed to associate with, and confided in her about the assault.  The two headed to Tabitha's grandfather's house and on the way, were spotted by the victim's older brother.  Fearing that her brother would tell she was with Tabitha, she ran inside Tabitha's grandfather's house, and Tabitha called the police to report the incident with Appellant.

2

Meanwhile, a missing child report had been issued on the victim, and Officer Dusty Staggs tracked her down at a different residence than Tabitha's grandfather's. He took her into protective custody and called for assistance from a female officer, Patsy Curry, to interview her. He also called Child Protective Services. Officer Curry testified that the victim had been crying and was upset. After they worked out common definitions to describe body parts, the victim finally told Officer Curry that Appellant "had went inside her." Appellant and her sister were removed from their home by Child Protective Services and placed in foster care.

CPS referred the victim to Dr. Jennie Patrick, a pediatrician, for a sexual assault exam on March 1, 1988. In addition to a full exam of the victim, Dr. Patrick also interviewed the victim. According to her testimony, the results of the exam were inconclusive for full penetration of the female sexual organ; however, the victim had inflammation of the vestibule of the female sexual organ.

In a two-count indictment, Appellant was charged in 1990 with aggravated sexual assault by contact and penetration. At trial, however, the State elected to proceed only on the sexual contact allegation. As relevant to the allegations in the underlying case, the law in effect at the time Appellant was charged in 1988 was substantially the same as the current version.[1]

---

[1]*See* Act of May 29, 1987, 70th Leg., R.S., ch. 1029, § 1, 1987 Tex. Gen. Laws 3474 (current version at Tex. Penal Code Ann. § 22.011(a) (Vernon Supp.2007)).

### Factual Sufficiency Standard of Review

Appellant contends the evidence presented during the guilt-innocence phase of the trial was factually insufficient. The Texas Court of Criminal Appeals has adjusted a direct appellate court's power to review factual sufficiency of the evidence in line with civil practice. *Marshall v. State*, 210 S.W.3d 618, 625 (Tex.Crim.App. 2006), *cert. denied*, __ U.S. __, 128 S.Ct. 87, __ L.Ed.2d __ (2007), citing *Watson v. State*, 204 S.W.3d 404, 415 (Tex.Crim.App. 2006). When conducting a factual sufficiency review, we examine all the evidence in a neutral light and determine whether the jury was rationally justified in finding guilt beyond a reasonable doubt. *Zuniga v. State*, 144 S.W.3d 477, 484 (Tex.Crim.App. 2004), *overruled in part by Watson*, 204 S.W.3d at 415-17. Evidence can be factually insufficient in two ways: (1) the verdict seems clearly wrong or manifestly unjust or (2) the verdict is against the great weight and preponderance of the evidence. *Marshall*, 210 S.W.3d at 625. A factual sufficiency review permits the reviewing court to substitute its judgment for a jury's on questions of credibility and weight determinations, "albeit to a very limited degree." *Id.*, citing *Watson*, 204 S.W.3d at 417. Nevertheless, we cannot reverse a conviction unless we find some objective basis in the record that demonstrates that the great weight and preponderance of the evidence contradicts the jury's verdict or that an appellant's conviction is "clearly wrong or manifestly unjust." *Watson*, 204 S.W.3d at 417.

Additionally, as directed by the Texas Court of Criminal Appeals, we must consider the most important evidence that an appellant claims undermines the jury's verdict. *Sims*

*v. State*, 99 S.W.3d 600, 603 (Tex.Crim.App. 2003). Cognizant that we are to consider all evidence in a neutral light in conducting a factual sufficiency review, we are not, however, required to discuss all evidence admitted at trial. *See id. See also Roberts v. State*, 221 S.W.3d 659, 665 (Tex.Crim.App. 2007).

The jury is the exclusive judge of the facts. Tex. Code Crim. Proc. Ann. art. 36.13 & 38.04 (Vernon 2007). As a reviewing court, we must always remain cognizant of the jury's role and unique position in evaluating credibility and demeanor of witnesses and giving weight to contradictory testimonial evidence. *Johnson v. State*, 23 S.W.3d 1, 8-9 (Tex.Crim.App. 2000). Reconciliation of conflicts in the evidence is within the exclusive province of the jury. *Margraves v. State*, 34 S.W.3d 912, 919 (Tex.Crim.App. 2000). Unless the record clearly demonstrates a different result is appropriate, we must defer to the jury's determination. *Johnson*, 23 S.W.3d at 8.

**Analysis**

In support of his factual insufficiency contention, Appellant maintains that the evidence is too weak to support guilt beyond a reasonable doubt. He also asserts there were inconsistencies in the victim's and her sister's testimony and challenges the victim's credibility on whether she was fully penetrated because she later retracted her story after her examinations revealed no physical evidence of injury.

5

## Inconsistencies in Testimony

The inconsistencies in the victim's and her sister's testimony that Appellant complains of are (1) his instructions to the victim's sister to look out the window after he called the victim to his bedroom and (2) what the sister heard after the bedroom door closed. The victim testified that Appellant instructed her sister to look out the window and watch for their mother while they were in the bedroom. Her sister testified that Appellant instructed her to look out the window for "anybody" and "shout and tell him" if anyone approached. The victim also testified that after Appellant closed the bedroom door, he pushed a chair underneath the doorknob. Her sister testified that she heard the "doorknob [sic] close" and nothing else.

The inconsistencies Appellant complains of are subtle; the gist of his instructions to the victim's sister, regardless of whether the jury believed the victim or her sister, was for the victim's sister to act as a lookout while he and the victim were in the bedroom. Inconsistencies in testimony are for the jury to resolve and because the record here does not reflect that a different result is appropriate, we must defer to the jury's determination.

## Degrees of Penetration

Dr. Patrick testified that the victim's exam was normal except for inflammation of the lining of the vestibule, which could have resulted from poor hygiene or partial penetration. During cross-examination, she testified that when she first questioned the victim, she said

that Appellant had put his penis "inside" her and moved it up and down. During redirect examination, Dr. Patrick explained that she and the victim did not discuss the different areas of the female sexual organ that could be penetrated. Her report provided that the victim indicated that Appellant had "bumped his penis up against her." She determined that although the physical evidence was inconclusive for full penetration, it was possible for her findings to be consistent with the victim's story–that Appellant partially penetrated her at least through the vestibule of the female sexual organ. Additionally, she testified that given the number of days between the incident and the initial exam–February 20 to March 1–physical injuries, if any, would have probably healed.

On March 9, 1988, the victim was examined by Dr. Rafael Garcia, a pediatrician specializing in child abuse, neglect, and sexual abuse cases. He testified that the victim never indicated full vaginal penetration and reported that Appellant had pushed his penis against her vagina. With the use of generic slides, Dr. Garcia testified about the different parts of the female sexual organ and explained that a child could be easily confused on the different degrees of penetration. The results of his exam of the victim, a prepubescent girl, revealed that her hymen had extra tissue known as "redundant folds." Although he agreed with Dr. Patrick that there was no physical evidence of forceful penetration, the lack of findings did not necessarily contradict the victim's allegations. Partial penetration without physical injury was possible. In response to questioning, Dr. Garcia testified that he believed the victim's story.

Appellant maintains that the victim changed her story from penetration to partial penetration of the "folds" of her sexual organ after realizing that the medical exams revealed no physical evidence of injury. We disagree.

The evidence indicates that the victim was unfamiliar with the male and female sexual organs. In fact, she used anatomically correct dolls during her testimony. She testified that when questioned by Officer Curry, she told her that Appellant had "went inside her," because she didn't know otherwise. During trial, she testified that Appellant put his private part "between the folds," and explained that she first heard the term "folds" from Officer Curry.

During cross-examination, Officer Curry was asked why her report reflected that Appellant had "penetrated" the victim. She explained that she understood the victim to mean penetration when she reported that Appellant "had went inside her." She also testified that she and the victim did not discuss what "inside" or penetration meant.

The defense strategy was that the victim had fabricated the allegations because she knew she would get in trouble for associating with Tabitha. Appellant argues that he brought out facts contrary to the verdict during the victim's cross-examination. Specifically, he points to evidence that the victim was not upset at the time of the incident but was crying and upset when found by Officer Staggs five days later.

8

Officer Staggs testified that when he found the victim, she was crying and upset and did not want to go home. The victim testified that she was relieved when police arrived. According to the victim, Appellant had threatened to hurt her if she disclosed what had happened. She also testified that she was aware that if she recanted her allegations, she could leave foster care and live with her mother. She was not willing to do so and added that she did not want to live with her mother if Appellant was there. The victim's sister likewise testified that she preferred to live with her mother, but not if Appellant was living with them.

## Conclusion

Viewing all the evidence in a neutral light, we find no objective basis in the record that demonstrates that the great weight and preponderance of the evidence contradicts the jury's verdict or that Appellant's conviction is clearly wrong or manifestly unjust. We conclude the evidence is factually sufficient to support Appellant's conviction. His sole issue is overruled.

Accordingly, the trial court's judgment is affirmed.

Patrick A. Pirtle
Justice

Do not publish.

9