Opinion issued February 7, 2008







 

 






In The

Court of Appeals

For The

First District of Texas






NO. 01-07-00065-CR






JOHN EDWARD COLLINS, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 337th District Court

Harris County, Texas

Trial Court Cause No. 1054859






MEMORANDUM OPINION

 A jury convicted appellant, John Edward Collins, of capital murder committed
in the course of a robbery. See Tex. Penal Code Ann. § 19.03(a)(2) (Vernon Supp.
2007). The State did not seek the death penalty, and the trial court assessed
punishment at life imprisonment without parole. See id. § 12.31(a); Tex. Code Crim.
Proc. Ann. art. 37.071, § 1 (Vernon 2007). Appellant contends the evidence is
factually insufficient to support his conviction. We affirm.

BACKGROUND

 A Houston police officer was dispatched to a shooting at an apartment complex
at 2:00 a.m. on January 14, 2006, arriving within minutes of receiving the dispatch. 
Upon arrival, the officer was approached by Chalondra Shelton, who was frantically
waiving her arms to get his attention. Shelton directed the officer to the unit where
the shooting had occurred and led him toward the bedroom where the body of the
decedent, Charles Frear, lay lifeless, having suffered multiple bullet wounds to the
head. Two tenants of the apartment, Cynthia Miller and Matthew Hawkins, stood in
the bedroom doorway, as did the decedent's seven-year- old son. 

 Miller and Hawkins were common-law spouses living together with Kathryn
Ross and Ross's boyfriend, Terrance Simmons. Simmons, previously homeless, had
just recently come to live with Miller, Hawkins, and Ross. Shelton, Frear, and Frear's
son were temporarily residing with the others at the time of the murder, although they
were all present in the apartment on the night of the shooting. Another individual,
Keshaun Hamilton, was also present at the apartment on the night of the murder, but
fled the scene shortly after the chaos ensued. Hamilton admitted to being a drug
dealer and to supplying Miller with drugs on the evening of the murder. Hamilton
went to and from the apartment on several occasions that evening and admits 
smoking crack cocaine and marihuana with Miller on that evening. 

 Earlier in the day on January 13, Ross cashed a $10,000 check she had received
from her grandfather. After cashing the check, she met a friend who supplied her
with drugs--ecstasy and marihuana--and she spent about an hour smoking
marihuana and taking a couple of ecstasy pills. Ross also admits to having smoked
about three cigarettes dipped in embalming fluid over a several-hour period on that
day. Late in the day, Ross returned to the apartment where all the tenants were
present. She took Simmons aside and gave him $2,000 to spend on drugs, which he
planned to resell. After paying some bills, Ross planned on spending the remainder
of the money on a car. Shortly thereafter, Ross and Frear smoked a "sweet," a cigar
filled with marihuana, and drank some wine coolers. 

 Simmons and Frear then left the apartment, but Frear returned a short time
later, reporting that Simmons had been bragging to others about the money Ross had
acquired. Simmons then returned with some drugs and left again. Shortly after
Simmons's departure, there was a knock at the door. Hamilton, Miller's drug
supplier, entered the apartment followed by a man in a black skull cap who burst
through the door brandishing a pistol and yelling at everyone present to get on the
ground. The intruder, whom the witnesses within the apartment subsequently
identified as appellant, demanded that Ross give him the money. Ross refused and
the intruder responded by repeatedly striking her on the head with the pistol. The
intruder then took Frear by the collar, dragged him into the bedroom, and threatened
to kill him if Ross did not hand over the cash. Frear was pleading with the intruder
not to harm his son. Although Ross handed over the bag of money, the intruder
proceeded to shoot Frear in the back of the head and then fled. 

 Homicide detectives spoke with and received statements from Miller, Hawkins,
and Shelton on the same day that the murder took place. All three witnesses provided
an alias of a possible suspect, John-John, whom police later identified as appellant. 
The detectives then constructed a photo array that included appellant's photograph. 
Each of the witnesses was shown the photo spread independently of one another and
each identified appellant as the intruder. With the possible exception of Shelton, who
appeared worried when presented with the photo array, the witnesses displayed no
hesitation in making their choice. Ross testified to being within inches of appellant
when Frear was shot. Her description of the distance of pistol from the decedent's
head when it was fired was also consistent with the Medical Examiner's report about
the proximity of the gun to the decedent's head. 

 At trial, appellant presented the testimony of his cousin and brother, who
claimed to have been drinking beer with appellant for most of the day at appellant's
mother's apartment. Appellant's cousin claimed to have left the apartment around
1:40 a.m on January 14th and insisted that appellant was still at his mother's
apartment at that hour. In addition, appellant's cousin testified to never having seen
appellant drive or own a Cadillac, which is the type of car in which the witnesses saw
appellant leave. Appellant's brother also testified that the crime scene was some 15
miles from appellant's mother's apartment. Appellant's girlfriend testified that she
picked appellant up from his mother's apartment at between 2:00 a.m and 2:15 a.m.
on the morning of January 14.

FACTUAL SUFFICIENCY

 In his sole point of error, appellant contends the evidence is factually
insufficient to support his conviction. In a factual sufficiency review, we view all the
evidence, both for and against the finding, in a neutral light, and set aside the verdict
if the proof of guilt is so obviously weak as to undermine confidence in the jury's
determination, i.e., when the verdict seems "clearly wrong and manifestly unjust," or
the proof of guilt, although legally sufficient, is nevertheless against the great weight
and preponderance of the evidence. Watson v. State, 204 S.W.3d 404, 414-15 (Tex.
Crim. App. 2006). A jury is in the best position to evaluate the credibility of
witnesses, and we are required to afford "due deference" to the jury's determinations.
Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006). In conducting a
factual-sufficiency review, we must also discuss the evidence that, according to the
appellant, most undermines the jury's verdict. See Sims v. State, 99 S.W.3d 600, 603
(Tex. Crim. App. 2003).

 Appellant acknowledges that five separate witnesses positively identified him
as the murderer. However, he argues that this case presents "special problems"
because "[t]he witnesses were all, at the time of the events in question, under the
influence of mind-altering controlled substances such as cocaine, marijuana, ecstacy,
embalming fluid, codeine and alcohol." Appellant also argues that his alibi witnesses
were "believable and coherent."

 A witness's intoxication bears on credibility, which is a matter reserved for the
jury. Cain v. State, 958 S.W.2d 404, 409 (Tex. Crim. App.1997) ("None of these
factors--that [the witness] was drunk, had trouble remembering the assault, and had
been extremely intoxicated previously--definitively favor or contradict the jury's
verdict; all bear on the amount of credibility [the witness's] testimony should
receive."). A witness's intoxication during a robbery is a factor that weighs on the
credibility of the witness. See Jasso v. State, 112 S.W.3d 805, 809 (Tex.
App.--Houston [14th Dist.] 2003, pet. ref'd); see also Vasquez v. State, 67 S.W.3d
229, 237 (Tex. Crim. App. 2002) (holding that rational jury could believe eyewitness
had accurately identified defendant despite witness's use of narcotics). Even if the
defendant calls a sober, but potentially biased, alibi witness, the jury can choose to
believe the testimony of an eyewitness on cocaine. See id. at 237-38.

 In this case, the jury was free to believe the testimony of the five eyewitnesses
to the murder, despite their drug use, and to disbelieve the testimony of appellant's
alibi witnesses. See Vasquez, 67 S.W.3d at 237-38; Cain, 958 S.W.2d at 408-09,
Such a determination is within the exclusive province of the jury, and we must show
deference to such a jury finding. Id.

 After viewing the evidence in a neutral light, we cannot say that the evidence 
is so weak that the verdict is clearly wrong and manifestly unjust, or that the verdict
is against the great weight and preponderance of the evidence. Accordingly, we
overrule appellant's sole point of error.CONCLUSION

 We affirm the judgment of the trial court.



 Sherry Radack

 Chief Justice


Panel consists of Chief Justice Radack and Justices Jennings and Bland.


Do not publish. Tex. R. App. P. 47.2(b).