Opinion issued July 26, 2007



















In The

Court of Appeals

For The

First District of Texas






NO. 01-06-00235-CR

____________


EDWARD HEWITT MACDONALD, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 230th District Court

Harris County, Texas

Trial Court Cause No. 1046437






MEMORANDUM OPINION

 A jury found appellant, Edward Hewitt MacDonald, guilty of the offense of
sexual assault (1) and, after he pleaded true to the allegations in two enhancement
paragraphs that he had two prior felony convictions, assessed his punishment at
confinement for twenty-five years. In his sole point of error, appellant contends that
the evidence is factually insufficient to support his conviction.

 We affirm.

Factual Background

 The complainant testified that on October 31, 2005, she and her girlfriend ate
dinner, went to a Halloween block party, and then went home. The complainant had
a "couple of margaritas and maybe two or three vodka drinks" in the span of "[r]ight
over two" hours and then had a glass of wine at home. After they got home, around
midnight, the complainant decided to go by herself to Lola's Bar, where she knew she
could purchase powder cocaine. When she arrived at Lola's, she did not see the
person from whom she normally bought cocaine. When she went up to the bar to
order a drink, she stood next to appellant, whom she had never seen before, and spoke
with him for the entire time that she was at the bar, mentioning to appellant that she
had a "girlfriend." While she was at Lola's, the complainant had another two or three
alcoholic drinks. Stating that six or seven such drinks over the course of an entire
night is "not extraordinary" for her, the complainant "didn't feel that [she] was
wasted" and had a clear memory of the night.

 Appellant gave the complainant a business card with his name and telephone
number on it, and she put the card in her purse. After she determined that her
"dealer" was not going to show up at the bar, she asked appellant whether he knew
anyone from whom they could purchase cocaine. Appellant told the complainant,
"Let me make a quick phone call and if you don't mind driving us right around the
corner, it's not too far. We could go get it." Appellant used his cellular phone to
make a call and then told the complainant, "it's a deal." They decided to ride
together, and the complainant volunteered to drive. The complainant and appellant
drove to a location "right past Telephone Road," where they each paid twenty-five
dollars for cocaine. When they left the location, the complainant was on the phone
with her friend, Mark Ziefchek. She spoke with Ziefchek throughout the course of
the night, making plans to go to his warehouse, where he was throwing a party. 
Appellant asked if they could stop at his storage unit, which was nearby, in order to
"grab some more money." 

 The complainant and appellant then drove through an opened gate to the
storage facility, and she parked the car. The complainant, who was "still kind of
messing with [her] phone," thought that appellant was going to go into the unit to get
some money. She described her car as a long, two-door car, with a console between
the driver and passenger seats. While the complainant was using her phone, sitting
in the driver's seat, appellant made a sexual comment. He said something about the
possibility of sex, and ended the comment with, "Too bad because I've got a big
dick." This was the first sexual comment of the evening. At this point, the
complainant and appellant had already used some cocaine. The complainant was
"kind of shocked" and told appellant that such a comment was inappropriate. 
However, she did not feel threatened, and, after appellant made another sexual
comment, she, in a "half joking like" manner, told appellant that she would "kick [his]
ass." 

 "All of a sudden in one instance," appellant was "over" the complainant, and
she was "out the door, and [they] were out on the ground." As they fell out of the car,
appellant landed on top of her with her back on the ground. The complainant used
her legs to "maneuver [her] hands to wiggle to see if [she] could get out from
underneath," causing her to slide along the ground backwards. Appellant was not
very violent, but, by the weight of his right forearm across the complaint's chest and
with his left hand holding onto her arm, he was able to prevent her from moving. She
"cuss[ed]" at appellant, saying, "You mother fucker . . . You know, I know your
name. I know . . . the people at Lola's know you. I am going to look you up." She
thought that she was about to get away and tried to shove her knees up. Appellant
told her to stop struggling and that she was going to make it worse. She then thought
that she was going to be "murdered." Appellant told her to stop struggling and said,
"I don't want to do anything to you. I just want to go down on you." 

 After appellant removed her pants, he "went straight to going down and having
oral sex on [her]," placing his mouth on her sexual organ. She explained that she
never consented to having sexual intercourse with appellant and, at this point, she
was crying and "was still pissed." She did not try to get away because she did not
think that she would be fast enough and thought that if she did attempt to escape,
appellant still had his arms on her legs. If she was caught, "it would just make it
worse."

 Appellant performed oral sex on the complainant for an "exaggerated amount
of time, over 30 minutes." Every once in a while, "it would just stop and words were
said," with "lulls in between." She told appellant that she was freezing and asked if
they could at least get back inside the car. When appellant agreed to get back inside
the car, she told him to get in the car on the passenger's side, but he pushed the
complainant into the car and said, "Stop fucking around." She entered through the
driver's door and, after being pushed by appellant, ended up behind the passenger's
seat. Appellant got into the backseat with the complainant and "apologized some
more, started talking." When she asked for her pants back, appellant refused. She
then asked appellant if he still wanted to go to her friend's party, telling appellant that
her friend was still waiting. 

 In the backseat of the car, "just out of the blue," appellant grabbed both her
legs, pulled her up, and again started performing oral sex. Then appellant, sitting
upright behind the driver's seat, "took his pants off and started masturbating." 
Unable to get an erection, he said, "Girl, you're going to have to help me out here,"
and he grabbed the complainant behind her neck with his right hand and penetrated
her mouth with his sexual organ. This lasted "probably three to five" minutes. 
During that time, appellant was not able to obtain an erection. When asked whether
she consented, the complainant replied, "Absolutely not." The complainant explained
that, up until this time, she had never been involved in any kind of a sexual act with
a man.

 Appellant then got "over" the complainant, started "masturbating again with
his hands," positioned the complainant, and said, "Maybe this will work." Although
still unable to obtain an erection, appellant was able to cause penetration of her sexual
organ by placing his sexual organ inside her sexual organ. Afterwards, appellant
"just went back to his seat real fast put his head in his hands and just more talking to
himself apologizing." The complainant explained that they had sex for "over four
hours," with the events having "many lulls and ups and downs."

 As it started to become daylight, appellant asked the complainant to take him
back to his truck at Lola's. She agreed, appellant let her grab her pants, and she put
her clothes back on. Appellant then got out of the car and picked up some
belongings, but the complainant could not drive away because appellant had her car
keys. Appellant handed her the car keys after he sat in the passenger seat.

 The complainant explained that, during the course of the entire evening, her
friend, Mark Ziefchek, had tried to call her about eight times. Although she was able
to speak with him sometimes during the lulls, she never told Ziefchek that she was
in trouble because she thought that appellant would become more violent. As they
were making "small talk" as the complainant drove appellant back to Lola's,
appellant wanted to make sure that she had his telephone number. When they arrived
back at Lola's at 6:00 a.m., the complainant pulled in behind appellant's truck. 
Appellant apologized about the events of the night and gave her a second business
card. Appellant told the complainant his cellular phone number, and she wrote it
down on the back of the business card. He then got out of her car and got into his
truck.

 After appellant got out of her car, she again called Ziefchek and then called for
emergency assistance and went to Joe's Car Wash, where she met a police officer. 
She told the officer that she had been sexually assaulted and agreed to ride with the
officer to have a rape examination performed at a hospital. At the hospital, the
complainant felt sober and told a nurse that she had been raped and had used cocaine
that evening.

 The complainant further explained that she stopped fighting appellant because
she was trying to think of a plan to get away and "[e]verything that [she] did [she]
was physically forced to do, and it was to save [her] from going to the next level of
being murdered." She conceded that appellant never slapped or hit her, never took
her cellular phone away, and let her talk on the phone.

 Dr. Adel Gindy testified that on November 1, 2005, he, assisted by Angela
Adolph, performed a genital examination on the complainant and "there was no
evidence of any forced entry to the genital area." However, he explained that sexual
intercourse can happen without injuries regardless of whether both parties are
consenting. Therefore, the absence or presence of an injury is not necessarily helpful
in determining whether a sexual assault has occurred. The lab results showed that
there was "some sperm" in the secretions in the specimen Gindy collected. Aside
from the genital examination, Gindy observed "some bruises and abrasions" on the
complainant's back. 

 Angie Adolph, a registered nurse, testified that the complainant was escorted
into the hospital by a police officer and appeared "[v]ery quiet, withdrawn." The
complainant was cooperative, and her hands were shaking. She smelled of alcohol,
but did not appear to be intoxicated. The complainant's right wrist was bruised, with
a "reddish purple" coloration indicating that the bruise was recent. There was a
purple bruise on her left outer thigh and her "back to lumbar area" was "scraped up." 
The scrapes on her back appeared to be fresh injuries and were consistent with what
the complainant said had happened. 

 Houston Police Department ("HPD") Officer B. Roberts testified that on
November 7, 2005, he took a sworn statement from the complainant. During the
interview, the complainant "was occasionally tearful, occasionally trembled." She
"paused at times when she was talking about things that were going on," but was very
forthright. The complainant identified appellant from a photo array. Roberts and the
complainant drove to the storage facility where the sexual assault occurred and there
were tire tracks and cigarette butts on the ground outside the storage shed. Inside the
shed, Roberts found a business card from "MacDonald and Son." Roberts also
observed scrapes and injuries to the complainant's body, consistent with her version
of events.

 Appellant testified that on October 31, 2005, he went to Lola's to have a few
drinks and play pool. After shooting pool, he sat down by himself at the corner of the
bar. The complainant came up to him, and he asked her what was wrong because she
looked "depressed or sad or something." She told him that she was looking for some
cocaine. The complainant acted like she was in a hurry, and the two did not speak for
long prior to her inquiring about cocaine. Appellant told the complainant that he
might know somebody, and he called an acquaintance from work and told him that
he would come over to purchase some cocaine.

 After buying the cocaine, he and the complainant "did a few bumps of the
coke," (2) and he asked the complainant to drive by his storage unit so that he could get
some more money. He did not enter the storage unit because it was not until they
arrived there that he realized that he had left the keys to the unit inside his truck. 
Once they were parked at the storage unit, appellant and the complainant "did some
coke" using the keys to his truck. He explained that he never took the car keys out
of the complainant's car ignition. The two discussed the complainant's "sex life that
she was a lesbian that she used sex toys and stuff with her relationship" and that it
had been "a long time since she's been with a man." They both got out of the car "to
get some fresh air" and appellant smoked a cigarette.

 Outside of the car, the two "were just talking, small talk," and then "were
hugging and kissing each other." The complainant "was kind of being real
aggressive" and they "went to the ground and started still kissing and stuff." She
"undid her pants and pulled her pants down, and [appellant] helped her take her pants
off." The complainant was the person that removed her belt and pants, and appellant
helped pull them off from her feet. The complainant never told appellant to stop or
quit, and "never cried, screamed, nothing." Appellant described the complainant's
demeanor as "like a nympho but real wild, real aggressive, moving around a lot." 
Appellant never threatened her, and she never told him to stop. The complainant told
appellant that "she was really getting into it, and it felt very good" as appellant was
performing oral sex on her. 

 After being outside for about fifteen minutes, the complainant told appellant
that she was cold so he suggested that they get back inside the car. The two "did
some more coke." Her cellular phone rang several times while they were in the car,
and she answered the phone multiple times. After appellant performed oral sex on
the complainant in the car, she performed oral sex on appellant for ten to fifteen
minutes. When they engaged in intercourse, the complainant was "real aggressive,
kind of like, you know, moving around a lot." When asked whether the complainant
appeared to be enjoying the intercourse, appellant responded, "Most definitely." 
Afterwards, appellant was "real hot, sweating, perspiring; and [his] heart was beating
kind of fast because the coke and . . . the sex." The complainant put her hand on
appellant's chest and asked him if he was alright.

 After intercourse, while the complainant was in the backseat, appellant got out
of the car to put his clothes on. Appellant smoked a cigarette and used the restroom
beside the storage unit, about fifteen to twenty feet from where the car was parked. 
At this time, the complainant's car keys were still in the ignition. Appellant noticed
that the complainant had a bruise inside of her thigh, and one on her arm near her
wrist. As they left the storage unit, appellant looked at his cellular phone and saw
that it was around 5:30 a.m. He explained that he never apologized to the
complainant at any time during the evening. After the complainant dropped off
appellant at his truck, the next thing appellant heard about the night was about one
week later, when he was arrested. Appellant agreed with the State's statement during
cross-examination that he felt that the complainant was "framing him" for
wrongdoing in order to avoid "getting into trouble" with her girlfriend. Appellant
explained that he felt that the complainant was using him as a scapegoat because
"she's probably going to get kicked out of her relationship with her girlfriend because
she had an affair with a heterosexual man."

Standard of Review

 In a factual sufficiency review, we view all the evidence in a neutral light, both
for and against the finding, and set aside the verdict if the proof of guilt is so
obviously weak as to undermine confidence in the jury's determination, i.e., that the
verdict seems "clearly wrong and manifestly unjust," or the proof of guilt, although
legally sufficient, is nevertheless against the great weight and preponderance of the
evidence. Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). We
note that a jury is in the best position to evaluate the credibility of witnesses, and we
are required to afford "due deference" to the jury's determinations. Marshall v. State,
210 S.W.3d 618, 625 (Tex. Crim. App. 2006).Factual Sufficiency

 In his sole point of error, appellant argues that the evidence is factually
insufficient to support his conviction because, although the complainant positively
identified appellant as sexually assaulting her, the complainant's testimony "was so
thoroughly impeached and totally rebutted by cross examination of [S]tate witnesses
and by defense witnesses leaving no credible evidence" that appellant sexually
assaulted the complainant. 

 A person commits the offense of sexual assault if the person intentionally or
knowingly:

(A) causes the penetration of the anus or sexual organ of another
person by any means, without that person's consent;


(B) causes the penetration of the mouth of another person by the
sexual organ of the actor, without that person's consent; or


(C) causes the sexual organ of another person, without that person's
consent, to contact or penetrate the mouth, anus, or sexual organ
of another person, including the actor.


Tex. Pen. Code Ann. § 22.011(a)(1) (Vernon Supp. 2006). A sexual assault is
without the consent of the other person if "the actor compels the other person to
submit or participate by the use of physical force or violence." Id. § 22.011(b)(1). 
Here, the underlying indictment alleged that appellant committed sexual assault
without the consent of the complainant under subsections (a)(1)(A), (a)(1)(B), and
(a)(1)(C) of section 22.011 of the Penal Code by compelling her to submit and
participate by the use of physical force and violence. See id. § 22.011(a)(1), (b)(1). 
Appellant asserts that the sexual contact that occurred between him and the
complainant was consensual.

 In support of his argument that there was no credible evidence that a sexual
assault occurred, appellant asserts that (1) Dr. Gindy, who performed the
complainant's genital exam, "testified that from the exam, there was no evidence of
any forced entry to the genital area and no injuries"; (2) the complainant testified that
she was "drunk enough to be impaired" and had been using cocaine; (3) appellant's
testimony "completely rebuts and denounces every element of assault and is
completely consistent with the physical evidence, including the phone records, the
DNA evidence, the doctor's testimony, and her so called injuries"; and (4) the
"amount of cocaine use and alcohol consumption admitted by [the] complainant, and
the fact that . . . Mark Ziefchek called a number of times and she spoke with him but
did not tell him she was in trouble, also admitted by [the] complainant, make it
impossible for any rational trier of fact to conclude that is was a sexual assault."

 Although Dr. Gindy testified that there was no evidence of any forced entry to
the complainant's genital area, he also testified that the absence of injury to the
genital area is not necessarily indicative that a sexual assault did not occur. In fact,
Dr. Gindy further testified that the complainant's vaginal exam results were
consistent with either consensual or nonconsensual sexual conduct. Also, although
the complainant was intoxicated and under the influence of cocaine at the time of the
assault, this does not mean that she therefore consented to appellant's sexual assault. 
The jury was within its discretion to believe the complainant's version of events,
wherein she claimed that she did not consent to the sexual acts, and to disbelieve
appellant's testimony that the complained of sexual acts were consensual. We note
that "[t]he testimony of a victim, standing alone, is sufficient to support a conviction
for sexual assault." Villalon v. State, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990);
Jensen v. State, 66 S.W.3d 528, 534 (Tex. App.--Houston [14th Dist.] 2002, pet.
ref'd). Moreover, the jury is the sole judge of the credibility of the witnesses at trial. 
See Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). Finally, although the
complainant spoke by cellular phone with her friend, Mark Ziefchek, a number of
times during the night of the incident in question, the jury could have reasonably
believed, consistent with the complainant's testimony, that the reason that she did not
expressly ask for Ziefchek's help was that she was in fear of further retribution or
aggression by appellant.

 Thus, viewing the evidence neutrally, we conclude that the evidence is not so
weak that the verdict is clearly wrong or manifestly unjust or that the proof of guilt
is against the great weight and preponderance of the evidence. Accordingly, we hold
that the evidence is factually sufficient to support the jury's implied finding that the
complainant did not consent to the sexual contact and that appellant sexually
assaulted the complainant.

 We overrule appellant's sole point of error.


Conclusion

 We affirm the judgment of the trial court.



 Terry Jennings

 Justice


Panel consists of Justices Taft, Jennings, and Alcala.


Do not publish. Tex. R. App. P. 47.2(b). 
1. See Tex. Pen. Code Ann. § 22.011(a)(1) (Vernon Supp. 2006).
2. During her testimony, the complainant explained that the most convenient way to use
cocaine if you are out at a bar is to "use your keys and just get a lit bit on the end of
your key." This method is referred to as a "bump."