

## NUMBER 13-03-00411-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

---

**LEVIYAS JAMAIL CLAYTON,**                              **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                      **Appellee.**

---

### On appeal from the 183rd District Court of Harris County, Texas.

---

## MEMORANDUM OPINION ON REMAND

### Before Chief Justice Valdez and Justices Yañez and Garza
### Memorandum Opinion on remand by Justice Garza

Appellant, Leviyas Jamail Clayton, was convicted of murder and sentenced to thirty years' imprisonment. *See* TEX. PENAL CODE ANN. § 19.02(b) (Vernon 2003). On original submission, we found that the evidence adduced at trial was legally insufficient to sustain Clayton's conviction. *See Clayton v. State*, 169 S.W.3d 254 (Tex. App.–Corpus Christi 2005), *rev'd*, 235 S.W.3d 772 (Tex. Crim. App. 2007). The Texas Court of Criminal Appeals reversed, holding that the evidence met the standard for legal sufficiency. *See Clayton v. State*, 235 S.W.3d 772, 782 (Tex. Crim. App. 2007). We now consider on remand whether the evidence was factually sufficient to prove that Clayton committed

murder. Because we find that the evidence was factually sufficient, we affirm the judgment of the trial court.

## I. Background

While driving near the entrance of Houston's Brock Park in the early afternoon of June 14, 2001, Houston Animal Control employee Angela Davis observed a pickup truck lose control in front of her and overturn into a ditch. Davis and her partner stopped their vehicles and provided assistance. About ten to twenty minutes after they stopped, Davis noticed something moving inside the park; upon further investigation, she discovered a man, James Playonero, covered in blood and apparently suffering from several gunshot wounds. Playonero attempted to communicate, but Davis could not understand his mumbling. Although Davis called the police for assistance, Playonero died before any medical attention could be rendered. Davis testified at trial that, from the time she stopped to assist the driver of the truck that veered off the road to the time she went to investigate the movement in the park, she did not see or hear any other people or vehicles enter or exit the park.

Davis further testified that she found Playonero lying on the ground near a white 1995 Toyota Avalon, which had its trunk and rear door open; the vehicle appeared to have rolled up against a tree. A trail of blood leading from the car indicated that Playonero had crawled out of the rear passenger compartment of the Avalon and collapsed where he was found. Upon further investigation of the Avalon, police discovered that the gearshift was in neutral and the ignition was in the accessory position. The police also found a tire iron on the front seat, which they suspected had been wedged against the accelerator so that the car would propel itself into the trees, and a wad of charred paper lodged in the fuel tank filler neck, indicating that someone had tried to destroy the car by igniting the tank. The vehicle's back seat and rear floorboard were soaked with blood, and a moderate amount of blood was found on the vehicle's exterior.

2

Roger Milton, M.D., an assistant medical examiner with the Harris County Medical Examiner's Office, testified at trial that Playonero was shot eight times at close range and died within five to ten minutes after suffering the wounds. Milton also testified that it was impossible for Playonero to have lived for twenty to thirty minutes after receiving those gunshot wounds.

Sergeant Boyd Smith of the Houston Police Department, who was one of the first police officers to arrive at the scene, testified that he suspected that Playonero's murder was the result of a drug deal gone bad. He based this opinion on the fact that both Playonero and Angel Ayala, the owner of the vehicle, were Colombian, and because of the nature of Playonero's wounds.[1]

Al Padilla, an investigator with the Houston Police Department, testified that he identified fingerprints on the Avalon belonging to Playonero, Clayton, and Ayala.[2] The fingerprints belonging to Clayton were found on the Avalon's steering wheel and gearshift, as well as on the center console between the car's front seats. Clayton's prints were caused by his touching the steering wheel, gearshift, and center console with Playonero's blood on his hands.

Officer Jesus Sosa of the Houston Police Department was assigned to investigate Playonero's death. Officer Sosa testified that his investigation produced no evidence directly linking Clayton to Playonero other than the bloody fingerprints found at the crime scene. No eyewitnesses were identified, and no murder weapon was found. However, a warrant was issued for Clayton's arrest eight days after Clayton was identified through the bloody fingerprints.

---

[1] Sergeant Smith testified as follows regarding Playonero's gunshot wounds:

The fact that he was shot in both legs, twice in both legs, once in the forearm, once through and through in the flesh and the stomach, shot in the penis, shot in the middle of the back of the neck, they were torturing him or trying to get information or getting information from something over a bad drug deal.

[2] Ayala was initially investigated for the murder, but was ultimately cleared of suspicion after he informed a police officer that he had loaned the car to Playonero on the morning of June 14 and was at home alone when Playonero was shot.

Sosa testified that he and his partner attempted to locate Clayton for a week after the warrant was issued. Sosa testified that he advised Clayton's grandmother, mother, girlfriend, and father's girlfriend about the outstanding warrant. Clayton was not arrested until he was stopped for a traffic violation in March 2002, some eight months after the incident at Brock Park.

Clayton, testifying in his defense, stated that he drove to Brock Park on the morning of June 14 in order to meet an acquaintance, Tiffany Woods. Clayton testified that, as he approached the entrance to the park, he observed a blue car exit the park at a high rate of speed. He testified that, upon entering the park, he looked for Woods but did not find her; he did, however, find the white Avalon with Playonero's left hand hanging outside the rear passenger compartment of the vehicle. Clayton then described what he did next:

Q. [Defense counsel] When you got up to the vehicle, what else, if anything, did you notice at the vehicle?

A. [Clayton] That there was a man in the backseat.

Q. A man laying in the backseat?

A. Yes, sir.

Q. What did you notice about the man?

A. That he was full of blood, sir.

Q. When you noticed this man in the backseat full of blood, what did you do?

A. I reached out and touched him, sir.

Q. What did – why did you touch him?

A. Because he was mumbling, and I couldn't understand what he was saying.

Q. After you reached and touched the man, did you do anything else as far as the car is concerned?

A. Yes, sir.

4

Q. What did you do?

A. I ran around the driver's side of the door. I got in the car and I tried to put the car in reverse, but the gravel around the car was – where the ground was wet and the mud was, the car wouldn't move.

Clayton testified that he then saw a pickup truck, traveling at a high rate of speed, veer off the road and overturn in a nearby ditch. Clayton testified that he panicked at that point, got out of the Avalon, returned to his car, and left the park, passing the Animal Control officers' vehicles as he departed. Clayton then returned to the house that he shared with his grandmother. On cross-examination, Clayton admitted that he did not call the police or tell anyone else about what he had seen. He testified that he did not know about the warrant until his arrest on a traffic violation eight months later.

After trial, a jury convicted Clayton of murder and sentenced him to thirty years' imprisonment. Clayton appealed his conviction, and this Court found that the evidence was legally insufficient to support the jury's verdict, relying primarily on *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001) (mere presence is not enough to prove guilt) and *Medina v. State*, 7 S.W.3d 633, 637 (Tex. Crim. App. 1999) (failing to notify authorities of a crime is not enough to prove guilt). *See Clayton*, 169 S.W.3d at 258. The court of criminal appeals reversed, noting that the amount of blood found on Clayton's fingerprints, along with Davis's testimony that no other vehicles left the park, Clayton's sudden flight from the crime scene, and his failure to turn himself in to police on the arrest warrant, constituted legally sufficient circumstantial evidence to support a finding of guilt. *See Clayton*, 235 S.W.3d at 780. We now consider whether the evidence was factually sufficient to sustain the jury's guilty verdict.

## II. DISCUSSION

### A. Standard of Review

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Watson v. State*, 204 S.W.3d

5

404, 414 (Tex. Crim. App. 2006); *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005). We then ask (1) whether the evidence supporting the conviction is so weak that the fact-finder's determination is clearly wrong and manifestly unjust, or (2) whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder's determination is manifestly unjust. *Watson*, 204 S.W.3d at 414-15, 417; *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence contradicts the verdict. *Watson*, 204 S.W.3d at 417. A factual sufficiency review requires the reviewing court to consider all of the evidence. *Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006).

In determining whether the evidence is factually insufficient to support a conviction, it is not enough that this Court "harbor a subjective level of reasonable doubt to overturn [the] conviction." *Id*. We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in the evidence. *Id*. We may substitute our judgment for that of the jury on credibility and weight questions, "albeit only to a very limited degree." *Marshall*, 210 S.W.3d at 625. We will reverse a verdict of guilty on a factual sufficiency challenge only when we can say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Watson*, 204 S.W.3d at 417. We must give due deference to the fact-finder's determinations, particularly those determinations concerning the weight and credibility of the evidence. *Johnson*, 23 S.W.3d at 9.

To support a conviction for murder, the State had to prove that Clayton (1) intentionally or knowingly caused Playonero's death by shooting him with a firearm or (2) intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused Playonero's death by shooting him with a firearm. *See* TEX. PENAL CODE ANN. § 19.02(b); *Sanders v. State*, 119 S.W.3d 818, 820 (Tex. Crim. App. 2003).

6

**B. Analysis**

The evidence at trial established the following circumstances without dispute: Clayton was present inside the Avalon shortly after Playonero was shot; Clayton fled the scene when he saw a pickup truck overturn in his vicinity; Clayton did not inform the authorities about what he had seen; and the warrant for his arrest was outstanding for eight months before Clayton was detained. Clayton's explanation for his presence in the Avalon was that he was trying to save Playonero's life by pulling his vehicle out of the mud, but Clayton could not explain to the jury why it was necessary for him to commandeer Playonero's vehicle in order to accomplish that. Further, Clayton could not explain why it was necessary to touch Playonero's hand, nor could he explain how touching Playonero's relatively clean hand resulted in the accumulation of blood on Clayton's hands sufficient to transfer bloody fingerprints to the steering wheel, gearshift, and center console. Finally, Clayton could not explain why, if he was attempting to save Playonero's life, he failed to take the extra life-saving step of notifying the police of Playonero's condition after he had fled the scene.[3]

In a prosecution based on circumstantial evidence, it is not necessary that every fact point directly and independently to the guilt of the accused; rather, the cumulative effect of all the incriminating facts may be sufficient to warrant a conclusion of guilt. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). Here, weighing Clayton's dubious story against the cumulative force of the incriminating circumstantial evidence, and giving due deference to the jury's determinations as to the weight of the evidence and the credibility of witnesses, we cannot say that the evidence offered at trial, as a whole, clearly revealed that the conviction was inappropriate. *See Johnson*, 23 S.W.3d at 8, 9.

---

[3] We note that the only evidence tending to establish a motive for Clayton to murder Playonero was Sergeant Boyd's testimony that he believed Playonero's death was the result of a drug deal gone bad. However, although motive is a significant circumstance indicating guilt, *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004), it is not an element of murder and need not be proved to support a murder conviction. *Lerma v. State*, 632 S.W.2d 893, 895 (Tex. App.–Corpus Christi 1982, pet. ref'd) (citing *Garcia v. State*, 495 S.W.2d 257 (Tex. Crim. App. 1973)).

After considering all of the evidence adduced at trial, we conclude that the jury's verdict is not so contrary to the weight of the evidence as to be clearly wrong or manifestly unjust. *Watson*, 204 S.W.3d at 414-15, 417. Accordingly, we find that there was factually sufficient evidence to support the verdict.

### III. CONCLUSION

The judgment of the trial court is affirmed.

DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX.R.APP.P. 47.2(b)
Opinion delivered and filed
this the 5th day of June, 2008.

8