NUMBER 13-07-101-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


ERASMO FRAIRE SALAZAR, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 338th District Court of Harris County, Texas.


 


MEMORANDUM OPINION



Before Chief Justice Valdez and Justices Yañez and Benavides


Memorandum Opinion by Justice Yañez


 

 After a jury trial, appellant, Erasmo Fraire Salazar, was convicted of the offense of
murder, and his punishment was assessed by the jury at thirty years' imprisonment. On
appeal, Salazar's counsel filed a brief arguing that the evidence is factually insufficient to
support appellant's conviction, while Salazar filed a pro se brief arguing that he was denied
the effective assistance of counsel at trial. We affirm.

I. Factual Sufficiency

A. Applicable Law

 When reviewing the factual sufficiency of the evidence, we begin with the
presumption that the evidence supporting the verdict is legally sufficient. (1) We view all of
the evidence in a neutral light. (2) We may set the verdict aside if (1) the evidence is so weak
that the verdict is clearly wrong and manifestly unjust; or (2) the verdict is against the great
weight and preponderance of the evidence. (3) While we may disagree with the jury's
conclusions, we must exercise appropriate deference to avoid substituting our judgment
for that of the jury, particularly in matters of credibility. (4) Thus, while we are permitted to
substitute our judgment for that of the jury when considering credibility and weight
determinations, we may do so only to a very limited degree. (5)

 A person commits the offense of murder if he (1) intentionally or knowingly causes
the death of an individual or (2) intends to cause serious bodily injury and commits an act
clearly dangerous to human life that causes the death of an individual. (6) Intent can be
inferred from the acts, words, and conduct of the defendant. (7)

B. Trial Testimony

 On appeal, Salazar argues that there is factually insufficient evidence that he
intentionally or knowingly caused the death or serious bodily injury of the victim, Roberto
Mosqueda ("Roberto"). Accordingly, we shall only discuss the trial evidence that is relevant
to the issue of intent.

1. Magdalena Garcia Martinez's Testimony

 Magdalena Garcia Martinez ("Magdalena") was married to Roberto when he died
on May 7, 1984. When Magdalena first testified on December 5, 2006--more than twenty-two years after Roberto's death--her memory of what happened the night Roberto was
killed was not entirely clear. Prior to testifying, Magdalena reviewed a statement she had
given police shortly after Roberto was killed. Though Magdalena could recall talking with
police after Roberto's death, she could not recall giving them a statement.

 According to Magdalena, she and Roberto were in their apartment at 2:30 in the
morning on May 7, 1984. Around that time, she heard a persistent, loud knocking on her
door. She opened the door and saw Salazar and his girlfriend, Rosie. Magdalena and
Roberto were friends with Salazar and Rosie; they had known each other for approximately
fifteen months. Salazar entered the apartment and began yelling at Roberto. Salazar was
upset and his yelling related to the subject of Rosie's alleged infidelity. Magdalena testified
that Roberto had previously told Salazar that Rosie was cheating on him. Magdalena
remembered Roberto being asleep prior to Salazar's knocking, but she could not recall
whether Roberto awoke to Salazar's presence or whether Salazar attempted to awake
Roberto. She did recall Salazar shooting Roberto once with a gun, and Roberto falling to
the floor after being shot. Magdalena could not recall trying to get between Salazar and
Roberto before the shot was fired, but she did recall suffering gun powder burns on her
arm. Under questioning, Magdalena stated that she could not recall whether Salazar was
trying to shoot Roberto. She did testify, however, that (1) Salazar pointed the gun at
Roberto, (2) Roberto did not have a weapon and did not attempt to grab the gun from
Salazar, (3) Salazar shot Roberto, and (4) Salazar and Rosie then left the apartment.

 On the second day of Salazar's trial, Magdalena again testified. Under direct-examination by Salazar's counsel, Magdalena testified that Roberto sometimes carried a
pocketknife. She also testified about what transpired shortly before Roberto's death. 
According to Magdalena, Roberto went to a club with Salazar the evening before he was
killed. Roberto became intoxicated, and eventually returned to the apartment at 1:00 in the
morning, at which point he went to sleep. When Salazar knocked on the apartment door
later that night, Magdalena opened the door for him and turned on the lights inside the
apartment. (8) Salazar began asking Roberto if Rosie was going out with another man. 
Magdalena testified that Roberto responded to Salazar's questions, answering that he had
seen her with another man. Magdalena further stated that Roberto never attacked Salazar
or Rosie, and never attempted to grab the gun from Salazar.

 Under cross-examination by the State, Magdalena stated that she had not had an
opportunity to read a Spanish translation of her statement to police prior to her first day of
testimony, which had since been provided to her. Magdalena testified that (1) Roberto was
asleep when Salazar entered the apartment; (2) Salazar had been drinking and was upset
that night; (3) Salazar asked Roberto questions about Rosie; (4) Salazar kicked Roberto
in an attempt to awake him; (5) when Salazar aimed the gun at Roberto, Magdalena
jumped between them and asked Salazar to return the next day when he was calm; (6)
Salazar kicked Magdalena in the stomach to get her out of the way; and (7) Salazar then
shot Roberto in the stomach and left the apartment with Rosie.

2. Roger Milton's Testimony

 Roger Milton, an assistant medical examiner at the Harris County Medical
Examiner's Office, discussed Roberto's autopsy report. Milton stated that Roberto was one
to three feet from the gun when he was shot. He testified that Roberto's wound was not
a defensive wound (i.e., the type of wound someone receives when taking a defensive
posture). The autopsy report did not state that Roberto had any contusions, lacerations,
or injuries of any kind to his knuckles or hands. The report did reveal that Roberto's blood
alcohol level was .278. According to Milton, after reviewing pictures of Magdalena's arms,
which were taken shortly after Roberto's death, he was of the opinion that she was closer
to the gun than Roberto was at the time it was fired.

3. Salazar's Testimony

 Salazar testified that he went to a few bars with Roberto the evening before his
death. Salazar stated that he drove Roberto to a bar called the Rio Bravo. After
consuming alcohol together at the Rio Bravo, Roberto left the bar in Salazar's truck
because he needed to move items for his apartment. Salazar remained at the Rio Bravo,
waiting for Roberto to return. When Roberto returned to the bar two hours later, the men
remained drinking at the bar. When Roberto returned to the Rio Bravo, he showed Salazar
a pistol. According to Salazar, he and the bartender instructed Roberto to take the pistol
out of the bar, and Salazar told him to leave it in the truck. Roberto complied. While at the
Rio Bravo, Roberto repeatedly told Salazar that Rosie was cheating on him. According to
Salazar, he told Roberto that he wanted him to repeat his accusations in front of Rosie.

 The two eventually drove to another bar called El Columpio, where they continued
to drink alcohol. Salazar later dropped Roberto off at his apartment, and Salazar
proceeded to meet Rosie at a bar. After leaving the bar together, Salazar told Rosie that
he was going to Roberto's apartment so Roberto could repeat his accusations of infidelity
against Rosie in front of her. On their way to the apartment, Rosie discovered Roberto's
pistol. When they reached the apartment, Salazar took the pistol and placed it inside his
pant waistline with the intent of giving it back to Roberto.

 Salazar testified that he knocked on Roberto's door twice with normal force. 
Magdalena opened the door and invited him and Rosie inside. Salazar told Magdalena
that he wanted to speak with Roberto, but she told him that he was sleeping. According
to Salazar, it was dark in the apartment, preventing him from even seeing where Roberto
was sleeping. Magdalena walked toward where Roberto was sleeping but could not
awaken him. Salazar then walked toward Roberto and attempted to awake him, but he too
was unsuccessful. Salazar testified that after tying to awake Roberto, who was sleeping
in a very dark area of the apartment, Salazar returned to the entrance of the apartment. 
At that point, Rosie began telling Salazar that Roberto was a bad friend to him because he
had been trying to have an affair with her. When she said this, Roberto began yelling at
Rosie and threatening her. Salazar testified that though he could not see Roberto, he "felt
that [Roberto] got up and he hit Rosie." He also testified that he heard something that
sounded like a "blade," causing him to worry that Roberto had a pocketknife. Salazar
testified that after Roberto hit Rosie, Roberto then lunged at him. Salazar believed that
Roberto was attempting to remove the pistol from his waistband. Salazar testifed that
during his struggle with Roberto, the pistol accidentally fired, hitting Roberto. Salazar
checked Roberto's condition, but he was non-responsive. He told Magdalena to call an
ambulance, but no phone was available in the apartment. Salazar then fled the apartment
with Rosie because he became scared. (9)

4. Additional Witness Testimony

 Laura Romero testified that approximately three months prior to trial, she spoke with
Magdalena about Roberto's death. According to Romero, Magdalena told her that Roberto
had opened the door for Salazar on the night in question. Another witness, Armando A.
Arredondo, testified that shortly after Roberto's death, he overheard his wife have a
conversation with a woman named Nina. During this conversation, Nina told his wife that
Roberto had died while struggling for control of a gun.

C. Discussion

 In light of Magdalena's testimony, we find the evidence establishing that Salazar
intentionally or knowingly caused death or serious bodily injury to Roberto is not so weak
that the verdict is clearly wrong and manifestly unjust. (10) Though Magdalena's testimony
was sometimes contradictory, she steadfastly denied that Salazar had struggled with
Roberto for control of the gun, and asserted that Salazar pointed the gun at Roberto and
shot him. The jury was free to believe Magdalena's testimony over Salazar's. (11) In addition
to concluding that Magdalena was more credible than Salazar, the jury may have also
concluded that Magdalena's version of how the shooting took place was better supported
by the evidence (i.e., the testimony of the medical examiner, Robert Milton). Magdalena's
contention that she positioned herself between Salazar and Roberto, and that Salazar then
kicked her off to the side immediately prior to shooting Roberto, complements Milton's
opinion that Magdalena was closer to the gun than Roberto was when it fired.

 We further find that the evidence establishing that Salazar intentionally or knowingly
caused death or serious bodily injury to Roberto is not against the great weight and
preponderance of the evidence. (12) The jury was free to disbelieve the testimony of Salazar
and other defense witnesses--witnesses that were not present when Roberto was killed. (13) 
We do not believe the jury's verdict represents a manifest injustice. (14) Accordingly, we find
that the evidence is factually sufficient to support Salazar's murder conviction. Salazar's
sufficiency challenge is overruled.

III. Ineffective Assistance of Counsel

 Although Salazar is not entitled to hybrid representation, (15) we will address the
argument raised in his pro se brief in the interest of justice. The sole issue raised in
Salazar's pro se brief is an ineffective assistance of counsel claim. The court of criminal
appeals recently discussed the standard for reviewing this type of claim in State v. Morales,
stating:

 A claim of ineffective assistance of counsel entails two components. 
The appellant must establish both that his trial counsel performed deficiently
and that the deficiency operated to prejudice him. In evaluating the first
component, reviewing courts must not second-guess legitimate strategic or
tactical decisions made by trial counsel in the midst of trial, but instead "must
indulge a strong presumption that counsel's conduct falls within the wide
range of reasonable professional assistance[.]" This means that unless
there is a record sufficient to demonstrate that counsel's conduct was not the
product of a strategic or tactical decision, a reviewing court should presume
that trial counsel's performance was constitutionally adequate unless the
challenged conduct was so outrageous that no competent attorney would
have engaged in it. (16)


In his pro se brief, Salazar asserts that his trial counsel, Carlos Correa, "presented a 'false
witness' and manufactured evidence by procuring the services of Laura Romero to present
perjured testimony without [Salazar's] knowledge at the time of trial."

A. Laura Romero's Testimony

 Laura Romero's testimony at Salazar's trial was, to the say the least, bewildering. 
While under direct examination by Correa, Romero testified that she lived in Cleveland,
Texas, and was employed by a company as a marketing sales director, which required her
to visit different places to promote various companies interested in opening businesses in
predominantly Hispanic-populated areas. She stated that in September of 2006, she was
on a job assignment in Nebraska, where she was in a neighborhood surveying people
about their interest in Mary Kay Cosmetics. While in this neighborhood, Romero randomly
came upon Magdalena's home. Romero asserts that she did not know anything about
Magdalena at this time. Romero testified that she entered Magdalena's home to discuss
Mary Kay Cosmetics, and that she remained in the home for awhile because there was a
tornado in the area, and she wanted to remain in the home until the tornado passed. While
in the home, Magdalena began discussing the death of her late husband, Roberto. 
According to Romero, Magdalena told her that Roberto was shot by a friend after he
opened his apartment door for the friend. Romero testified that at some later date, a
detective from Dallas, who she could not name, called her. The detective told her that she
needed to appear as a witness at Salazar's trial in Houston. Romero testified that she
arrived at Magdalena's home by chance, and that she did not know Salazar or his trial
counsel at the time this occurred.

 After her direct examination, the State cross-examined Romero, resulting in the
following exchange:

 Q: You got a phone call out of the blue from a detective?

 

 A: Not, not at that moment. I received it after we were in that place.

 

 Q: How would somebody know that you had been to Magdalena Garcia
Martinez's home?

 

 A: No idea, ma'am.

 

 Q: Did somebody ask you to go to that home?

 

 A: No, ma'am.

 

 Q: Ask you to go to that home and talk to the victim?

 

 A: No, ma'am.

 

 Q: So, you are saying it was just out of the blue you happened by this
woman's home?

 

 A: Yes, ma'am. Me and my partner, yes.

 

 Q: And there just happened to be a storm that day?

 

 A: Yes.

 

 Q: And you just happened to open up with her?

 

 A: Well, I received a phone call from Dallas that I have to be in court for
some witness--that I have to be a witness. And then that's why she
say: Oh, I have to go to Houston, too. That's why we start talking
about that.

 

 Q: What I don't understand, though, is how it is possible that a door-to-door marketer would engage in a conversation like this with someone
and then you would be contacted by a detective at a later date?

 

 . . . .

 

 Q: Does that make any sense to you?

 

 A: No. I was even surprised, but what can I do?


 On the next day of Salazar's trial, the State conducted a direct examination of
Romero. The State's questioning challenged whether Romero was employed by Mary Kay
Cosmetics. Romero stated that she did not work for the company, but asserted that she
worked in correlation with the company. Romero testified that she did telemarketing for
different companies. When pressed by the State to name the employer that sent her to
Nebraska, Romero stated that her employer's name was "Telemarketing Company,"
located in Dallas, Texas. Romero could not provide an address for her employer. When
asked how one would contact her employer, Romero asserted that employees cannot
contact the company; rather, only the company can contact its employees.

B. Discussion

 If Salazar's counsel did in fact instruct Romero to commit perjury, then Salazar has
raised an ineffective assistance of counsel claim that warrants great consideration. An
attorney undoubtedly performs deficiently by knowingly presenting perjured testimony--for
permitting perjured testimony can never be a legitimate strategic or tactical decision. 
Whether or not an attorney's act of perjury is prejudicial, however, is a matter that must be
assessed on a case-by-case basis. In the instant case, Salazar needed the jury to find him
credible; it was his word against Magdalena's with regard to the manner in which Roberto
died. Accordingly, the concern for Salazar is whether his credibility with the jury suffered
as a result of Romero's testimony. (17)

 We are precluded from entertaining this concern because Salazar has not
presented this Court with any evidence to support the assertion that his trial counsel,
Carlos Correa, committed perjury at trial. Even if this Court were to sua sponte take
judicial notice of the fact that the Harris County District Attorney's Office charged Correa
with aggravated perjury, (18) stemming from Romero's testimony at Salazar's trial, (19) Salazar
would still be lacking the necessary evidence for his ineffective assistance of counsel
claim. Salazar's counsel must be presumed innocent, until proven guilty. Accordingly, it
would be imprudent to address Salazar's ineffective assistance claim when Salazar's
counsel has only been charged with perjury, rather than convicted of perjury. Because
Salazar has not presented this Court with a record solidly evidencing the basis for his
ineffective assistance claim, we overrule his issue on appeal. (20)

IV. Conclusion

 We affirm the trial court's judgment.




 

 LINDA REYNA YAÑEZ,

 Justice







Do not publish. Tex. R. App. P. 47.2(b).


Memorandum Opinion delivered and filed 

this the 20th day of November, 2008.

1. See Clewis v. State, 922 S.W.2d 126, 134 (Tex. Crim. App. 2006).
2. See id.; Cain v. State, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997).
3. Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006) (citing Johnson v. State, 23
S.W.3d 1, 11 (Tex. Crim. App. 2000)).
4. Drichas v. State, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005); see also Watson, 204 S.W.3d at 414
(stating that an appellate court should not reverse a verdict it disagrees with unless it represents a manifest
injustice, though supported by legally sufficient evidence).
5. Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006).
6. Tex. Penal Code Ann. § 19.02(b)(1), (2) (Vernon 2003).
7. Patrick v. State, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995).
8. Magdalena stated that she could not remember whether she had previously told anyone that
someone else had opened the door for Salazar. Magdalena later stated, however, that she had never told
anyone that Roberto opened the door for Salazar.
9. We note that Salazar was arrested shortly after Roberto was killed. Salazar was out on bond when
he failed to appear at his first scheduled trial. Salazar fled to Wisconsin, where he eluded authorities for two
decades. Salazar testified that he fled because he was afraid of the possibility of being found guilty and
receiving a lengthy sentence.
10. See Watson, 204 S.W.3d at 414-15.
11. See Lancon v. State, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008) ("Because the jury is the sole
judge of a witness's credibility, and the weight to be given the testimony, it may choose to believe some
testimony and disbelieve other testimony.").
12. See Watson, 204 S.W.3d at 414-15.
13. See Lancon, 253 S.W.3d at 707.
14. See Drichas, 175 S.W.3d at 799.
15. See Patrick, 906 S.W.2d at 498.
16. State v. Morales, 253 S.W.3d 686, 696-97 (Tex. Crim. App. 2008) (footnotes and quotations
omitted) (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)).
17. We observe that a jury would likely judge a defendant's credibility not only through his own
testimony, but also through the testimony he is perceived as proffering through witnesses speaking in his
defense.
18. See Tex. R. Evid. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute
in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot
reasonably be questioned."); Granados v. State, 843 S.W.2d 736, 738 (Tex. App.-Corpus Christi 1992, no
pet.) ("An appellate court may take judicial notice for the first time on appeal.").
19. See generally Brian Rogers, Attorney Arrested on Charges of Perjury, The Houston Chronicle,
Dec. 11, 2007, at B3 (discussing Correa's arrest after being charged with aggravated perjury for directing a
family friend, Laura Romero, to testify falsely in a murder trial).
20. We note that we have not decided whether Salazar did or did not receive ineffective assistance of
counsel as a result of the alleged perjury. Our decision to overrule Salazar's claim is based on the limited
record before us. Salazar may still submit his ineffective assistance of counsel claim for review on the merits
in an application for writ of habeas corpus. See Rylander v. State, 101 S.W.3d 107, 111 n.1 (Tex. Crim. App.
2003).