Affirmed and Memorandum Opinion
filed July 27, 2010.

 

In The

 

Fourteenth Court of
Appeals

                                                                                          



NO. 14-09-00125-CR

NO. 14-09-00126-CR



 

Giovanni
garcia, Appellant

V.

The State of Texas, Appellee

 



On Appeal from the 228th
District Court

Harris County, Texas

Trial Court Cause Nos.
1192364, 1192365



 

MEMORANDUM OPINION

            Giovanni
Garcia appeals his convictions of sexual assault and violation of a protective
order.  In two issues, appellant contends the evidence is legally and factually
insufficient to support the convictions and he received ineffective assistance
of counsel. Because all
dispositive issues are settled in law, we issue this memorandum opinion and
affirm.  See Tex. R. App. P. 47.4.

I.                  
Background

Appellant and X.M. began dating when she was a teenager.  In
August 2007, X.M., who was then nineteen-years-old, obtained a protective order,
effective for two years, prohibiting appellant from committing violence
against, threatening, harassing, or approaching within 200 feet of her.  Appellant
was accused of sexually assaulting X.M. less than four months later by
compelling her to submit to anal intercourse.  Appellant does not dispute that they
engaged in anal intercourse but claims the act was consensual.  To prove the
offense, the State presented the testimony of police officers and a nurse, to
whom X.M. described the incident shortly thereafter, as well as other witnesses,
because X.M. later recanted her original claim that the intercourse was
non-consensual and testified on appellant’s behalf.

According to Pasadena Police Officer Ryan Childers, on the
afternoon of November 21, 2007, he was dispatched to a Wal-Mart where he met X.M.
and her brother.  X.M. was scared, had a red face and “puffy” eyes, and
appeared to be in pain because she grimaced when she walked, was “hunched
over,” and gripped her abdomen.  X.M. said she had been “raped” by her
boyfriend.  As they spoke, X.M. continually looked around and said she was
fearful he was walking around and might see her.   

X.M. then described the incident as follows: she and
appellant had been drinking the previous night; he began pressuring her to have
sex; she told him “no” several times; he repeatedly said that she would participate
if she loved him; she finally consented to vaginal sex but stopped due to pain;
she rose from the floor and dressed; he told her to undress because “[her]
family never helped [her]” in the past; she undressed and again began vaginal
sex but repeatedly told him “no” and made “ugly faces”; he then stopped the
vaginal sex and penetrated her anus with his finger; she “jumped” from the
floor and attempted to cover herself and get away; appellant said that he would
“beat [her] fucking ass” if she tried to leave the room; he pushed her down and
began anal sex with her; she was scared and crying but appellant repeatedly
said he would “fuck [her] like this until [she] liked it”; she said she liked
it so that he would stop; when it ended, she vomited in the bathroom; he instructed
her to shower and “wash that thing” because she was bleeding from the anus,
which was staining the bedding and carpet; he lay in bed with her until she
fell asleep, asked how she liked it, and said he loved her; she awoke several
hours later and told her brother’s girlfriend “something bad happened” and to
keep a distance from appellant; when this brother, his girlfriend, and
appellant left the home, X.M. retrieved another brother, who was disabled, and
walked to Wal-Mart where she called the police.  

After
X.M. relayed these events, Officer Childers informed her that he needed to
collect her bedding as evidence.  X.M. became fearful that, if the bedding were
missing, Garcia would know she called the police.  Despite X.M.’s hesitation,
Officer Childers drove X.M. and her brother to their apartment.  Officer Childers
observed two large “brownish-red” stains, which appeared damp, on the bedroom
carpet.  After retrieving the bedding and clothes she wore during the incident,
he transported X.M. and her brother to the hospital.

Later
that afternoon, a sexual-assault nurse examiner, Sandra Martin, examined X.M.
at the hospital.  Martin testified that she initially asked X.M. to describe
what happened.  X.M. stated the following: her boyfriend was aggravated and
told her to remove her clothes; he started touching her, and she moved his hand
away; they began vaginal intercourse, and she told him to stop because it hurt;
he put his finger in her anal area, and she rose; he said, “if you leave, I’m
going to beat your ass”; he told her to lie back down and “raped” her in her
anal area with his penis.

During
the physical exam, Martin observed a 0.8 centimeter by 0.3 centimeter abrasion
in X.M.’s vaginal area and five separate tears in X.M.’s anus, ranging in size
from 0.2 centimeters to a 1.2 centimeter bleeding tear.  Martin explained that,
out of approximately 1,000 examinations she has performed, she has seen such a
large tear less than ten times.  Martin reported her findings to a doctor
because she was concerned further medical intervention might be necessary.

Sandra
Garza, a caseworker for a victim’s assistance program, testified she was
contacted by the hospital to provide crisis intervention to X.M.  When Garza
met X.M. in the emergency room, X.M. was upset and disheveled.  Garza explained
to X.M. her legal rights and the services offered by the program, but they had
no further contact.

A week after
the incident, X.M. voluntarily gave a statement at the police station to Officer
Matthew Bruegger, who was formally assigned the investigation.  At trial, Officer
Bruegger did not relay the contents of X.M.’s statement, but he testified it
was consistent with previous police reports, and she became upset and cried
during the interview.  After X.M. left, Officer Bruegger contacted appellant
but also did not testify regarding the substance of this conversation.  The
next day, X.M. called Officer Bruegger and said she was no longer interested in
“pursuing” the case.

The
contents of X.M.’s statement to Officer Bruegger were actually elicited by the
State during its cross-examination of X.M. when she was subsequently presented
as a witness by appellant.  Although X.M. attempted at trial to retract or
qualify some of her statements to Officer Bruegger, she agreed that she told him
the following: appellant said that, if she tried to leave the room, he would “grab
[her] by the hair and beat [her] ass” and he “did not understand why [she] did
not like having sex with [him]”; at one point, he stopped and asked if she
“wanted to get loud” and said “no one had saved you in the past”; she feared he
would hurt her if she fought back, or relatives might enter the room if she
screamed and he would hurt them; she was worried he would kill her after he
finished and she would “die from the pain”; he photographed his penis covered
in her blood and showed her the picture.

The State also
presented X.M.’s mother, who testified she disapproved of X.M.’s relationship with
appellant because X.M. had changed and was unhappy.  She also explained that X.M.
was afraid of appellant and upset about her mother testifying.

Pasadena
Police Officer Jason Buckaloo testified he was dispatched to the same Wal-Mart
on the night of December 7, 2007 and met with another officer and X.M., who appeared
upset and extremely nervous.  She showed Officer Buckaloo a text message from appellant
which read, “answer the fucking phone.”  Officer Buckaloo eventually
transported her home in his patrol car.  En route, Officer Buckaloo entered
appellant’s name in the police computer system and noted he had a warrant for
violation of a protective order.  Upon arrival at X.M.’s apartment, Officer Buckaloo
requested that she contact appellant.  X.M. was able to contact appellant who texted
her, “I know you called the cops.  Why are you doing this?  I just seen the
cops at the apartment.” and “Call me, [X.M.]”  After reading these messages Officer
Buckaloo called for assistance from other officers.  They searched the area but
were unable to locate appellant at that time.

At
trial, X.M. described the incident as follows: she and appellant drank alcohol
with relatives before retiring to their room in the early-morning hours; they
began consensual vaginal sex but then stopped; appellant persuaded her to
resume this activity although she initially resisted; he placed his finger in
her anus, which startled her, so she rose to run out of the room; he said that,
if she ran out of the room, “I’m going to beat your ass”; he then persuaded her
to begin vaginal sex again, but she became mad and told him to “get off” when
he accused her of faking pleasure; he asked if anyone in her family ever helped
her; he then persuaded her to have anal sex and told her to take a deep breath;
although she did not want to do so, she never told him to stop; at one point,
he photographed his bloody penis and showed her the pictures before resuming
the anal intercourse; he said to tell him when she “nutted” and “I’m not going
to stop until . . .  you tell me that you’re satisfied”; he did stop when she said
she was satisfied; at his suggestion, they showered together because she was
bleeding; she subsequently vomited from drinking too much alcohol; later that
day, she planned to take a walk with her brother but decided to call the police
during the walk. 

X.M.
expressly testified that the anal intercourse was “consensual.”  She attempted
to explain the accounts she gave shortly after the incident as follows: appellant
said he would “beat” her “ass” merely to prevent her from leaving the room
naked, and she was “kind of scared” but did not feel threatened; his statement
about no one in her family helping her was a general question about whether her
family ever helped her when she had a problem, as opposed to a threat; she denied
telling Officer Childers that appellant said he “would keep fucking [her] that
way until [she] liked it” and instead claimed he was concerned with her satisfaction;
photographing sex acts was not unusual in the relationship; she was confused,
scared, and “hung over” shortly after the incident and thought she had been
sexually assaulted but has since remembered more details and realized she had
been drinking; she went to the hospital at Officer Childers’s insistence and
did not believe she needed to do so; she thought the description she gave
Sandra Martin was true at that time but has since realized it was untrue;
relative to the encounter with Officer Buckaloo in December 2007, X.M.’s
brother called the police because the family was fighting, and X.M. did not
show the officer threatening text messages from appellant.

A jury found appellant guilty of sexual assault and violation
of a protective order.  Appellant pleaded “true” to one enhancement paragraph. 
The jury assessed punishment at sixty-five years’ confinement for the sexual-assault
conviction and twenty years’ confinement for violating the protective order. 
The trial court ordered the sentences to run concurrently.

II.              
Sufficiency of the Evidence

In his first issue, appellant contends the evidence is
legally and factually insufficient to support the conviction.  In his stated
issue, he mentions only the sexual- assault finding although he seems to appeal
both convictions.  Because appellant was accused of violating the protective
order by committing the sexual assault, we will broadly construe his issue as
challenging both convictions.     

A.       Standard of Review

When evaluating a legal-sufficiency challenge, we review all
evidence in the light most favorable to the verdict to determine whether any
rational jury could have found the essential elements of the offense beyond a
reasonable doubt.  Salinas v. State, 163 S.W.3d 734, 737 (Tex. Crim.
App. 2005).  The jury is sole judge of the credibility of witnesses and may
choose to believe or disbelieve all or any part of a witness’s testimony.  Sharp v. State, 707 S.W.2d 611, 614 (Tex. Crim.
App. 1986).  We ensure
only that the jury reached a rational decision and do not reevaluate the weight
and credibility of the evidence.  Muniz v. State, 851 S.W.2d 238, 246
(Tex. Crim. App. 1993).

In examining a factual-sufficiency challenge, we review all
evidence in a neutral light and set aside a verdict only if (1) the evidence is
so weak that the verdict seems either clearly wrong or manifestly unjust or (2)
the verdict is against the great weight and  preponderance of the evidence.  Marshall v. State, 210 S.W.3d 618, 625
(Tex. Crim. App. 2006); Watson v. State, 204 S.W.3d 404, 414–15 (Tex.
Crim. App. 2006).  Although we may substitute our judgment for the jury’s when
considering credibility and weight determinations, we may do so only to a very
limited degree and must still afford due deference to the jury’s
determinations.  See Marshall, 210 S.W.3d at 625.  

B.       Analysis

A person commits sexual assault if he intentionally or
knowingly causes the penetration of the anus of another person by any means,
without that person’s consent.  Tex. Penal Code Ann. § 22.011(a)(1)(A) (Vernon Supp.
2009).  A sexual assault under this subsection is without the consent of the
other person if “the actor compels the other person to submit or participate by
threatening to use force or violence against the other person, and the other
person believes that the actor has the present ability to execute the threat.” 
Id. § 22.011(b)(2).

Appellant essentially contends the State did not prove lack
of consent because there was no evidence appellant threatened physical force to
make X.M. submit.  As we have outlined, some aspects of X.M.’s statements to
the police officers and nurse differed from her trial testimony, but to the
extent they were similar, she attempted to qualify her earlier statements. 
The jury was free to believe X.M.’s
statements to the officers and nurse with respect to both their actual content and
meaning.  

Under all of X.M.’s versions of the incident, when appellant
placed his finger in her anus, she attempted to flee the room, but appellant
said he would “beat” her “ass” if she left.  As X.M. told Officer Childers, appellant
then pushed her down and began the anal intercourse.  Consequently, the jury
could have reasonably construed appellant’s statement as a threat of force or
violence made to compel the anal intercourse that followed.  Moreover, the jury
could have reasonably concluded that X.M. believed appellant had the present
ability to execute the threat based on his statement that no one in her family had
ever helped her, his threat to “fuck [her] like this until [she] liked it,” her
fear appellant would harm her or her family if she resisted or screamed, and her
fear appellant would kill her when the act was finished. 

Appellant contends he merely persuaded X.M. to agree to the various
sex acts after some initial resistance, she even “liked it,” and he terminated
each act when requested.  Even if X.M.’s actions demonstrated consent to
vaginal sex, only the subsequent anal intercourse was the basis of the sexual-assault
charge.  Under X.M.’s original accounts, she did not agree to the anal
intercourse and only said she “liked it” so that appellant would stop.  

Appellant also suggests that X.M. consented to the anal
intercourse because she did not resist, “definitively” communicate lack of
consent, seek help from others in the home, or make “outcry” to these other
persons after the incident.  However, resistance to the sexual assault by the
victim is not required; instead, the focus is on the compulsion of the actor.  See
Hernandez v. State, 804 S.W.2d 168, 170 (Tex. App.—Houston [14th Dist.]
1991, pet. ref’d).  Furthermore, X.M. explained to Officer Bruegger the reasons
she did not resist or call for help.  Moreover, the jury could have rationally
inferred that X.M. did not make “outcry” to anyone in the home after the
incident because she feared appellant while he was still present; however, she
retrieved her disabled brother and fled to Wal-Mart as soon as it felt safe to
do so.  

Additionally, appellant focuses on X.M.’s trial testimony
recanting her earlier accounts that the anal intercourse was non-consensual and
claiming appellant threatened to “beat” her “ass” simply to prevent her from
leaving the room naked.  According to appellant, X.M. was merely scared, confused,
and under the influence of alcohol when she gave her original accounts and
misperceived consensual “unorthodoxed” or “rough” sex as sexual assault.  

However, the jury could have rationally inferred X.M.’s
perception of the incident was more accurate when described shortly thereafter
and she later recanted based on fear of appellant.  Based on the following statements,
demeanor, actions, and condition of X.M. shortly after the incident, the jury
could have concluded she correctly perceived the anal intercourse as a non-consensual
sexual assault: she told another person in the home “something bad happened”
and to keep a distance from appellant; she called the police as soon as
possible; she was upset, afraid, and crying the afternoon after the incident
and even a week later during her statement to Officer Bruegger; she used the
term “raped” to Officer Childers and the nurse; she willingly submitted to a
sexual-assault examination; and she had one of the most severe anal tears the
nurse had ever seen.  

In sum, we conclude a rational jury could have found beyond a
reasonable doubt                                     that appellant committed
sexual assault and violation of a protective order, and the evidence is not so weak that the
verdict seems either clearly wrong or manifestly unjust or against the great
weight and preponderance of the evidence.  We overrule appellant’s first issue. 

III.           
Assistance of Counsel

            In
his second issue, appellant contends that he received ineffective assistance of
counsel in several respects.  To prevail on an ineffective-assistance claim, an appellant must prove
(1) counsel’s representation fell below the objective standard of
reasonableness and (2) there is a reasonable probability that, but for
counsel’s deficiency, the result of the proceeding would have been different.  Strickland
v. Washington, 466 U.S. 668, 687, 694 (1984); Thompson v. State, 9
S.W.3d 808, 812 (Tex. Crim. App. 1999).  In considering an
ineffective-assistance claim, we indulge a strong presumption that counsel’s
actions fell within the wide range of reasonable professional behavior and were
motivated by sound trial strategy.  Strickland, 466 U.S. at 689; Thompson,
9 S.W.3d at 813; Jackson v. State, 877 S.W.2d 768, 771 (Tex. Crim. App.
1994).  To overcome this presumption, a claim of ineffective assistance must be
firmly demonstrated in the record.  Thompson, 9 S.W.3d at 814.  In most
cases, direct appeal is an inadequate vehicle for raising such a claim because
the record is generally undeveloped and cannot adequately reflect the motives
behind trial counsel’s actions.  Rylander v. State, 101 S.W.3d 107,
110–11 (Tex. Crim. App. 2003); Thompson, 9 S.W.3d at 813–14. When the
record is silent regarding trial counsel’s strategy, we will not find deficient
performance unless the challenged conduct was “so outrageous that no competent
attorney would have engaged in it.”  Goodspeed v. State, 187 S.W.3d 390,
392 (Tex. Crim. App. 2005).

A.       
Consolidation of Cases for Trial

Appellant complains about his trial counsel’s actions purportedly
allowing a consolidated trial on both the sexual-assault and protective-order
cases.  On the day voir dire began, appellant’s counsel objected to a
consolidated trial on both charges.  The trial court responded that the cases
could be tried together if they arose from the same transaction, but it would consider
a separate trial.  However, the trial court warned that the sentences could be
“stacked” if the cases were tried separately.  After a brief recess for
appellant to consider his options, the trial court announced it denied “that
motion.”  

Appellant’s counsel then fully explained his objection for
the record: “yesterday when the defendant was arraigned, we understood he was
going to be tried on one case and he was only arraigned on the sexual assault
case.  So, we feel that it’s surprise now that the State wants to try both
cases together when I thought it was an agreement - -.”  The trial court
confirmed appellant’s counsel had previously set both cases for trial and thus
questioned that it was a “surprise.”  Appellant was then arraigned on the
protective-order charge.  His counsel requested additional time because he was
prepared for only the sexual-assault case and had a “completely different
defense” to the protective-order charge.  The trial court replied it intended
to start voir dire that day but would start trial the next day and counsel should
be prepared on both cases.  The trial court then formally overruled appellant’s
objection.

            Appellant
complains that counsel failed to file a pre-trial motion for severance pursuant
to Texas Code of Criminal Procedure article 28.01.  Under article 28.01, “The
court may set any criminal case for a pre-trial hearing before it is set for
trial upon its merits . . . . to determine” certain matters including “[p]leadings
of the defendant.”  Code Crim. Proc. Ann. art. 28.01, § 1 (Vernon 2006).  “When
a criminal case is set for such pre-trial hearing, any such preliminary matters
not raised or filed seven days before the hearing will not thereafter be
allowed to be raised or filed, except by permission of the court for good cause
shown; provided that the defendant shall have sufficient notice of such hearing
to allow him not less than 10 days in which to raise or file such preliminary
matters.”  Id. art. 28.01, § 2.  Appellant notes that the trial court
had previously set two hearings for pre-trial motions, but counsel did not file
any motion for severance; thus, appellant claims counsel waived the ability to
request a severance.  

            As
set forth above, the record indicates counsel had previously opted for one
trial; thus, filing a timely motion for severance before any pre-trial hearing
would have been contrary to his strategy.  The record further indicates that
counsel changed his strategy on the day voir dire began because appellant’s
arraignment on only one charge the previous day gave counsel the impression the
cases would be tried separately.  Article 28.01 allows a trial court to
consider an untimely pleading of the defendant for good cause shown.  See
id.  The trial court did consider counsel’s motion to sever, albeit at
the beginning of trial, although it denied the request.  Accordingly, appellant
has not demonstrated any further action counsel could have taken to obtain a
severance once he decided to pursue separate trials.

            As
we have mentioned, the trial court seemed to deny the motion partly because
appellant previously set both cases for one trial.  To the extent appellant
contends counsel performed deficiently by failing to ensure separate trials
from the outset, the record does not support this claim.  Appellant suggests that
counsel’s representation he had a “completely different defense” meant the defenses
were “conflicting.”  However, he could have equally meant the defenses were
simply unrelated, as opposed to conflicting.  Without a record affirmatively
showing the nature of the defense to the protective-order charge, we cannot
conclude counsel was ineffective by failing to ensure the cases were tried
separately.  During counsel’s cross-examination of witnesses, he attempted to
suggest appellant did not understand the protective order.  If ignorance of the
protective order was counsel’s intended defense, there is no record indicating he
was precluded from fully presenting this defense simply because the cases were
tried together.  

Appellant also asserts that, if counsel had ensured
separate trials, significant incriminating evidence otherwise admissible only
in the protective-order case would not have been admitted in the sexual-assault
trial.  Specifically, appellant suggests that issuance of the protective order
and testimony of X.M.’s mother were relevant to only the protective-order case;
thus, admission of this evidence in the joint trial improperly permitted the
jury to consider appellant’s character and past conduct when evaluating the
sexual-assault charge.  However, evidence regarding the relationship between
appellant and X.M., including his past conduct sufficient to justify a
protective order, was relevant to the sexual-assault case by showing she recanted
her earlier accounts based on fear of appellant.  Accordingly, we reject
appellant’s claim that counsel’s actions caused admission of otherwise
inadmissible evidence.

B.       
Preparation for Trial

Appellant
also contends counsel was ineffective because he was unprepared for trial in
two respects.  First, appellant cites counsel’s admission on the day voir dire began
that he was not prepared to defend the protective-order case.  However, the
trial court did allow counsel an additional day to prepare for the remainder of
the trial, and the record is silent on whether he was prepared that next day.  Again,
without a record affirmatively demonstrating the nature of the defense, we
cannot conclude counsel was inadequately prepared once trial began.

Next,
appellant complains that counsel failed to discover some letters which X.M.
wrote to Garcia while he was incarcerated after the incident.  During
cross-examination of X.M., the State introduced portions of three such letters
and questioned her regarding the contents of letters that were not admitted.  In
particular, the State asked X.M. whether she wrote in one letter that appellant
“raped” her, although this letter was not admitted.  X.M. responded that she
was referring to a molestation she experienced as a child.  In the admitted
letters, X.M. informed appellant that his lawyer instructed her not to “show up”
in court, although she testified these statements were merely her opinions as
opposed to actual instructions.  The admitted letters also contained the
following statement: “Your tellin me that its my fault that i have you in there
and that i can take you out . . . Well NO you put yourself in there Actions speak
way louder than words. . . .” [sic].

When
the State first mentioned the letters during trial, appellant’s counsel
objected several times that he had no opportunity to examine them and on the
basis of “Brady.”  Before the letters were admitted, the trial court allowed counsel
to examine them.  Counsel then stated he had no objection to admission of the
letters.  

Even
if trial counsel was deficient by failing to discover the letters, we cannot
conclude there is a reasonable probability the result of the trial would have
been different but for the deficiency.  Appellant suggests counsel might not
have presented X.M. as a witness if he had discovered the letters because they
alluded to appellant’s guilt and made counsel appear unethical and
unprofessional.  However, there is no record indicating the approach counsel might
have taken if he had known of the letters. 

Appellant
seems to contend that counsel’s lack of preparation harmed his defense because,
by presenting X.M., he allowed the State to inject the matters referenced in
the letters.  However, the most inculpatory references—that appellant “raped”
X.M. and he was to blame for his incarceration—echoed matters already proven by
the State through X.M.’s statements shortly after the assault.  Additionally,
the trial court allowed counsel to clarify that neither he nor his co-counsel
ever instructed X.M. to refrain from appearing in court or to violate a
subpoena.  Because this testimony was not then controverted by the State, we
cannot conclude the jury necessarily decided that trial counsel engaged in any
such conduct. 

Appellant
also argues that counsel’s failure to discover the letters precluded adequate
preparation of X.M., subjected her to cross-examination by “ambush,” and
undermined her credibility and effectiveness as a witness.  However, despite
any lack of preparation, X.M. did provide explanations attempting to qualify
some portions of the letters when confronted with them.  We cannot speculate
that X.M. would have provided credible, inculpatory explanations for all portions
of the letters admitted or referenced if she had been prepared to address them. 
Nevertheless, the jury was free to draw its own inferences from the letters
notwithstanding any explanations by X.M.  Thus, we cannot conclude that any
further preparation of X.M. to address the letters would have affected the
jury’s evaluation of her credibility.  Further, the jury heard ample other
grounds on which to question X.M.’s credibility; thus, we cannot conclude that the
few portions of the letters admitted or referenced at trial caused the jury to
disbelieve X.M.’s testimony.

C.       
Cross-Examination of Officer Childers

            Finally,
we address appellant’s contention that trial counsel was deficient in his
cross-examination of Officer Childers by eliciting the following testimony
which purportedly constituted legal conclusions damaging to appellant’s defense:
X.M. was “coerced” into the initial sex acts because she eventually consented
after appellant pressured her; appellant stopped the vaginal sex only after
“repeated nos”; and his statement that he would “beat [her] fucking ass” was a
threat and not made to prevent X.M. from leaving the room naked.  However, the
entire exchange reflects that counsel tried to obtain testimony showing the
whole episode was consensual, which was clearly his overall trial strategy.  Accordingly,
we cannot conclude counsel’s cross-examination was “so outrageous that no
competent attorney would have engaged in it” although he did not receive the
favorable responses that he sought. 

            In
sum, appellant has failed to demonstrate he received ineffective assistance of
counsel.  We overrule his second issue.  

            We
affirm the trial court’s judgment.

 








                                                                                    

                                                                        /s/        Charles
W. Seymore

                                                                                    Justice

 

Panel
consists of Justices Yates, Seymore, and Brown.

Do Not
Publish — Tex. R. App. P. 47.2(b).